Corrected 4/6/22

**NON-CONFIDENTIAL VERSION**

2022-1077

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

POKARNA ENGINEERED STONE LIMITED,
*Plaintiff,*

M S INTERNATIONAL, INC.,
*Plaintiff-Appellant,*

v.

UNITED STATES, CAMBRIA COMPANY LLC,
*Defendant-Appellees.*

Appeal from the U.S. Court of International Trade
Case No. 1:20-cv-00127
Judge Leo M. Gordon

# NON-CONFIDENTIAL RESPONSE BRIEF OF DEFENDANT-APPELLEE CAMBRIA COMPANY LLC

*Submitted by*
Luke A. Meisner
SCHAGRIN ASSOCIATES
900 Seventh Street NW; Suite 500
Washington, DC 20001
202-223-1700
lmeisner@schagrinassociates.com
*Counsel for Cambria Company LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1077

**Short Case Caption** Pokarna Engineered Stone Limited v. US

**Filing Party/Entity** Cambria Company LLC

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/06/2022

Signature: /s/ Luke A. Meisner

Name: Luke A. Meisner

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Cambria Company LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Paul W. Jameson | | |
| Geert M. DePrest | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| M S International, Inc. v. United States (CIT Ct. No. 20-137) | M S International, Inc. v. United States (CIT Ct. No. 20-138) | M S International, Inc. v. United States (CIT Ct. No. 20-139) |
| M S International, Inc. v. United States (CIT Ct. No. 19-140) | M S International, Inc. v. United States (CIT Ct. No. 19-141) | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........................................... 1
STATEMENT OF THE ISSUES ............................................... 1
STATEMENT OF THE CASE ................................................... 2
FACTUAL BACKGROUND ....................................................... 6
SUMMARY OF ARGUMENT .................................................... 12
ARGUMENT ........................................................................ 15

I. Commerce's Interpretation of the Term "Producer" Should Be Upheld ................................................................ 15
- A. Legal Standard ......................................................... 16
- B. Commerce Never Found That Fabricators Are Producers . 17
- C. This Court Has Previously Upheld Commerce's Interpretation of the Term "Producer" ............................ 19
- D. The Related Party Provisions of the Statute Have No Bearing on This Case ............................................. 21
- E. The Court's Decision in *Eurodif* Is Binding Precedent on the Interpretation of the Statute ................................... 23
- F. The Statute Is Silent Regarding the Term "Producer," Requiring an Analysis Under Step Two of *Chevron* ........... 28
- G. MSI Has Failed to Demonstrate Under Step Two of *Chevron* That Commerce's Interpretation of the Statute Is Unreasonable ............................................................ 33

II. Commerce's Determination That Fabricators Are Not Producers Is Supported by Substantial Evidence .................. 35
- A. Legal Standard ......................................................... 36
- B. Commerce Analyzed All of the Record Evidence and Arguments Raised by MSI ............................................ 37
- C. The Court Should Dismiss MSI's Attempts to Minimize the Evidence Regarding Fabricators' Minimal Production-Related Activities ..................................................... 39

D. Commerce and the Commission Can Reach Separate Determinations on Related Issues ........ 44

E. There Was No Reason for Commerce to Extend the Deadline for Initiation ........ 49

III. Even If Fabricators Are Producers, Commerce's Initiation of the Investigation Should Be Upheld ........ 51

A. Including Fabricators in the Calculation of Industry Support Would Result in Double-Counting ........ 51

B. Even If Fabricators Are Included in the Calculation of Industry Support, There Was Still Sufficient Support for the Petitions ........ 54

IV. Even If Industry Support Was Lacking, Commerce Had Authority to Self-Initiate Investigations ........ 57

V. Conclusion ........ 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFIDENTIAL MATERIAL

PROOF OF SERVICE

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), the confidential information in this brief is contained on pages 2-3, 32, 43-44, and 54. The material on pages 2-3, 32, 43-44, and 54 contains information regarding the volume of production by the domestic industry or fabrication by the fabricators that is relevant to the calculation of industry support, including information for which business proprietary treatment was requested by M S International Inc. in the underlying proceeding. This information was designated "confidential" in the underlying U.S. Court of International Trade appeal and in the underlying U.S. Department of Commerce administrative proceeding.

**Cases**

*Algoma Steel Corp. v. United States*, 12 C.I.T. 518 (1988) ..................... 45

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001)..... 36

*Asociacion Colombiana de Exportadores de Flores v. United States*, 693 F. Supp. 1165 (Ct. Int'l Trade 1988) ................................................... 45

*Brother Indus. (USA), Inc. v. United States*, 801 F. Supp. 751 (Ct. Int'l Trade 1992) ........................................................................... 20, 29

*Brother Indus. (USA), Inc. v. United States,* 801 F.Supp. 751(Ct. Int'l Trade 1992) ................................................................................. 28

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .......................................................................... 13, 20, 35

*Citrosuco Paulista, S.A. v. United States,* 704 F. Supp. 1075 (Ct. Int'l Trade 1988) ................................................................................. 58

*ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283 (Fed. Cir. 2015) .......................................................................... 30

*Consol. Bearings Co. v. United States,* 348 F.3d 997 (Fed. Cir. 2003)... 55

*Daewoo Elecs. Co. v. United States*, 6 F.3d 1511 (Fed. Cir. 1993).......... 17

*Eurodif S.A. v. United States*, 411 F.3d 1355 (Fed. Cir.)................ passim

*Gazelle v. Shulkin*, 868 F.3d 1006 (Fed. Cir. 2017) ............................... 29

*Haggar Apparel Co. v. United States*, 222 F.3d 1337 (Fed. Cir. 2000) .. 35

*Hosiden Corp. v. Advanced Display Mfrs. Of America*, 85 F.3d 1561 (Fed. Cir. 1996) .......................................................................... 45

*Huvis Corp. v. United States*, 570 F.3d 1347, 1355 (Fed. Cir. 2009) ..... 19

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008)........ 24

*King v. Briggs*, 83 F.3d 1384 (Fed. Cir. 1996) ........................................ 22

*King v. Burwell*, 576 U.S. 473 (2015) .................................................. 30

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994) ............ 17

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272 (Fed. Cir. 2014) ............................................................ 24

*Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ............................................................ 38

*Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577 (Fed. Cir. 1990) ............................................................ 45

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ............................................................ 36

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) .... 37

*P.T. Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) ................................................ 39

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ................................................ 20

*Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994 (Fed. Cir. 2020) ............................................................ 37

*Sunpreme Inc. v. United States*, 946 F.3d 1300, 1310 (Fed. Cir. 2020) . 38

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ............................................................ 59

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed.Cir.1994) ............................................................ 37

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ............................................................ 17

*Teva Pharm. USA, Inc. v. Sandoz*, Inc., 574 U.S. 318 (2015) ................ 24

*Torrington Co. v. United States*, 14 C.I.T. 648 (1990) ........................... 45

*U.S. Steel Corp. v. United States*, 36 C.I.T. 1172 (2012) ........................ 38

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ................................ 17

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951) ........................ 36

*USEC Inc. v. United States*, 27 C.I.T. 1419 (2003) .......................... 27, 28

*USEC Inc. v. United States*, 27 C.I.T. 489 (2003) .................................. 19

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007).. 16

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................ 36

19 U.S.C. § 1673a(a)(1) ......................................................................... 58

19 U.S.C. § 1673a(c)(4)(A) .................................................................... 15

19 U.S.C. § 1673a(c)(4)(B) .................................................................... 22

19 U.S.C. § 1673a(c)(4)(E) .................................................................... 39

19 U.S.C. §§ 1673a(b)(1) ....................................................................... 15

**Other Authorities**

Commerce Final Remand Determination, *USEC Inc. v. United States* (June 23, 2003) ................................................................... 20, 43

Customs Ruling H303280 (Apr. 25, 2019), 2019 WL 2345751 ............... 52

Customs Ruling N1015597 (May 10, 2010), 2010 WL 2152621 ............. 52

*Low Enriched Uranium From France*, 66 Fed. Reg. 65,877 (Dep't of Commerce Dec. 21, 2001) ................................................................. 25

*Polytetrafluoroethylene Resin from China and India*, Inv. Nos. 701-TA-588 and 731-TA-1392-1393 (Final), USITC Pub. 4801 (July 2018) .... 53

*Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451, USITC Pub. 5061 (June 2020) (Final) ..... 5

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) ........................ 27, 47, 51

*Thermal Paper from Germany, Japan, Korea, and Spain*, Inv. Nos. 731-TA-1546-1549 (Final) USITC Pub. 5237 (Nov. 2021) .......................... 53

**Regulations**

19 C.F.R. § 351.401(h) (2004) .................................................................. 26

Defendant-Appellee Cambria Company LLC ("Cambria" or the "Petitioner") respectfully submits this brief in response to the opening brief of M S International ("MSI") in the appeal of the decision by the Court of International Trade (the "CIT") in *Pokarna Engineered Stone Ltd. v. United States*, CIT No. 20-127 ("MSI Br.").

## STATEMENT OF RELATED CASES

Counsel is aware of the following cases before the CIT that may be affected by this Court's decision in the pending appeal:

*M S International, Inc. v. United States* (CIT Ct. No. 20-137);

*M S International, Inc. v. United States* (CIT Ct. No. 20-138);

*M S International, Inc. v. United States* (CIT Ct. No. 20-139);

*M S International, Inc. v. United States* (CIT Ct. No. 19-140); and

*M S International, Inc. v. United States* (CIT Ct. No. 19-141).

## STATEMENT OF THE ISSUES

1. Whether the Court should uphold Commerce's interpretation of the statutory term "producer" as meaning an entity that has sufficient production-related activities in the United States such that it has a stake in the domestic industry.

2. Whether substantial evidence supports Commerce's decision that fabricators of quartz surface products ("QSP") do not perform sufficient production-related activities to be considered "producers."

3. Whether Commerce correctly found that, even if fabricators are producers, the quantity of QSP they fabricate should be excluded from the calculation of industry support to avoid double counting.

4. Whether substantial evidence support's Commerce's finding that, even if fabricators were treated as domestic producers and even if their fabrication quantity is included in the calculation of industry support, there was still sufficient support to initiate the underlying investigation.

5. Whether Commerce's initiation of the investigation should be nullified by the Court even though Commerce has the authority to self-initiate investigations based on its own statutory authority and the evidence before it.

## STATEMENT OF THE CASE

In May 2019, Cambria filed a petition for the imposition of antidumping duties on QSP from India. *See* Petition, (May 8, 2019), Appx0048. The petition included the support of Cambria [ INFORMATION

REGARDING SUPPORT] large domestic QSP producer. *Id.* at Ex. I-4, APPX0110-0112, APPX. Cambria subsequently provided a declaration of support from Trend Group USA, another domestic QSP producer. Petition Amendment (May 24, 2019) at 1 and Ex. 1, Appx0868-0870. Through these submissions, Cambria demonstrated that producers accounting for [>50]% of domestic production supported the filing of the petition. Initiation Checklist, Att. II, pg. 8, Appx1024.

On May 24, 2019, MSI, a large U.S. importer of QSP, filed comments challenging Cambria's demonstration of industry support for the petition. *See* MSI Standing Challenge (May 24, 2019) at 2-6, Appx-392-0396. MSI, as an importer, argued that QSP "fabricators" should be considered "producers" for purposes of calculating industry support and that Cambria's petition did not account for the opposition of the fabricators to the provision of relief. *Id.* MSI's submission included 270 declarations from fabricators who described their operations as [ DESCRIPTION ] QSP. *Id.* at 6, Ex. 6, Appx0396, Appx0546-0826. The fabricators stated that they opposed the petition because they had [ STATEMENT OF REASON FOR OPPOSING PETITIONS ]. *Id.* at 6, Ex. 6, Appx0396, Appx0546-0826. On May 28, 2019, Cambria responded

to MSI's standing challenge with a wide variety of evidence showing that fabricators do not perform sufficient production-related activities or have a stake in the domestic industry to qualify as "producers" for purposes of calculating industry support. *See generally* Cambria Standing Response (May 28, 2019) ("CSR"), Appx0879-1001.

On May 28, 2019, Commerce initiated the antidumping duty investigation on QSP from India. Initiation Checklist, Appx1002. After reviewing the evidence relating to fabricators submitted by MSI and Cambria, Commerce found that fabricators did not perform sufficient production-related activities to constitute "producers" for purposes of determining industry support. *Id.* at Att. II, Appx1017, Appx1025-1032. Commerce found there are significant differences in the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment between quartz surface product slab producers and fabricators. *Id.*, Appx1030-1032. In particular, Commerce found that "fabricators simply convert an existing slab into a geometrical form for its end use or application" and noted that "many fabricators rely on imported slabs to produce final fabricated products." *Id.*, Appx1030.

The U.S. International Trade Commission ("Commission") also examined whether fabricators should be considered "producers," albeit for a different purpose – *i.e.*, to determine whether the domestic industry had suffered material injury by reason of subject imports of *Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451, USITC Pub. 5061 (June 2020) (Final) ("USITC Pub. 5061") at 9-12. After gathering information relevant to this question, the Commission determined that fabricators are "producers" for purpose of determining material injury, and it invited the fabricators to participate in the investigation as producers by responding to its U.S. Producers' Questionnaire. *See id.* In the end, however, only two fabricators actually participated in the investigation by submitting responses to the Commission's U.S. producer's questionnaire. *Id.* at 23.

After Commerce and the Commission reached affirmative determinations, MSI filed a challenge at the CIT to Commerce's determination that there was sufficient industry support to initiate the investigations. *See Pokarna Engineered Stone Limited v. United States*, Slip Op. 21-138 (Ct. Int'l Trade 2021) ("Slip Op."), Appx0017. On

October 7, 2021, the CIT sustained Commerce's determination with respect to industry support. *Id.*, Appx0019. This appeal by MSI followed.

## FACTUAL BACKGROUND

QSP are a compacted stone composite material used for countertop surfaces and other surface applications. *See* USITC Pub. 5061 at I-13. QSP compete with other stone products and surfaces such as granite and marble. *Id.* Producers of QSP invest in the development of new collections and patterns to attract customers. *Id.* These patterns require specialized machinery and design by teams of engineers whose end products and production processes are copyrighted as intellectual property. *Id.* After developing new designs and patterns and configuring their production equipment to make these designs, QSP production plants produce QSP in a large rectangular slab form. *See* CSR at 6 and Ex. 2, Appx0884, Appx0940-0941. Production plants for QSP require highly complex and interconnected machinery and engineering processes, and the actual production process – excluding steps such as developing designs and retooling equipment to make these designs – involves seven separate steps: (1) mixing raw materials, (2) combining,

(3) dispensing and molding, (4) pressing, (5) curing, (6) cooling, and (7) polishing. *Id.*; *see also* Initiation Checklist, Att. II, Appx1031. The capital investment for a new QSP production plant ranges from $40 million to hundreds of millions of dollars. *Id.*, Appx1027. Cambria's plant in Le Sueur required hundreds of millions of dollars in capital investment to establish, and Cambria has invested millions in the facility each year since. CSR at 7, Appx0885. Caesarstone, a second domestic producer of QSP, invested $100 million for its new slab plant in Richmond Hill, Georgia. *Id.*

Most QSP slabs, including imported QSP, are sold to fabricators. USITC Pub. 5061 at 19. Fabricators also stock and sell other products such as granite, marble, soapstone, and porcelain. CSR at 6 and Exhibit 2, Appx0884, Appx0940-0941. Fabricators cut the slabs of QSP, granite, marble, or other material to their final dimensions before they are installed as kitchen countertops or other applications. *Id.* Fabricators consult with the end-use customer about the dimensions of the surface needed prior to installation. Initiation Checklist, Att. II, Appx1031. Fabricators then cut the slabs and perform edge and surface finishing operations so that they are ready for installation. *Id.* Fabrication does

not alter the fundamental physical properties of the underlying slab in any way. CSR at 6 and Exhibit 2, Appx0884, Appx0940-0941. All of those essential physical characteristics are imparted in the slab production process. *Id.* QSP remains QSP after fabrication. Marble remains marble after fabrication. The capital investment required for the largest and most sophisticated fab shops are only several million dollars, but a typical fab shop can be established for as little as $50,000 to $100,000. *Id.*, Appx0885-0886.

The much greater capital investment required for QSP slab production is a function of the expensive, large, and specialized equipment required to produce QSP slabs. *Id.*, Appx0886. A new slab production line can cost over $100 million. *Id.* The equipment must be large enough to produce finished slabs that are about five feet wide by ten feet long or even larger. *Id.* When it filed the petitions, Cambria's plant in Le Sueur contained five production lines and covered approximately 1,000,000 square feet. *Id.* By contrast, the equipment fabricators use to cut QSP slabs into their final form is relatively straightforward and broadly available and is also used to cut other products such as marble and granite. *Id.*, Appx0886-0887. There is no

specialized equipment dedicated exclusively to *fabricating* QSP slabs like the specialized equipment and technology dedicated solely to *producing* QSP slabs. *Id.*, Appx0887. The only equipment required to fabricate is a saw to cut the slab and a hand-router to finish the edges. *Id.* Some fabricators also have a computer numerical control ("CNC") machine for cutting holes or other shapes out of the slab. *Id.* Because of the limited equipment required, a fab shop is a much smaller operation than a slab production plant, with even the largest fabrication facilities not exceeding 50,000 square feet. *Id.*

There is also much greater technical expertise required to produce QSP slabs than to fabricate them. *Id.* Cambria and other QSP slab producers use a number of complicated processes that must be executed with precision in order to produce slabs with the required physical characteristics. *Id.*, Appx0887-0888. This includes mixing raw materials together in precise recipes, combining the materials in specific ways, dispensing them into molds, pressing the materials together to release any air pockets, curing and cooling the slabs, and polishing them. *Id.*, Appx0888. Producing QSP slabs requires specialized knowledge not only of the complex equipment involved, but

also the specific raw materials, chemistry, recipes, and processes required to produce slabs with the desired physical characteristics, designs, and appearance. *Id.* Cambria conducts innovation and research and development activities at its plant in Le Sueur to create new designs in QSP, which have been an important factor in growing demand for QSP. *Id.* Fabrication shops, on the other hand, fabricate the offerings developed and produced at the QSP plant, as well as surface products from other sources such as stone quarries. *Id.*, Appx0888

Because of the technical expertise required to produce QSP, Cambria employs a team of engineers, who hold bachelors of science degrees in fields such as mechanical engineering, chemical engineering, material science, chemistry, geology, manufacturing engineering, and industrial engineering. *Id.* There is no comparable level of technical expertise involved in fabrication. *Id.*, Appx0889. The minimum requirements for operating a fab shop—the ability to operate a saw, potentially a CNC machine, and polishing equipment—are less involved and less complicated. *Id.* CNC technology is a generic or universal technology that uses a computer-controlled system to assist with cutting

and finishing many different types of materials such as wood, metals, and stone. *Id.,* Appx0889-0890.

There are far more employees required to produce a QSP slab than to fabricate one. *Id.,* Appx0890. At the time it filed the petitions Cambria employed over 600 full time employees in Le Sueur, while one of Cambria's larger and more sophisticated related fab shops employed roughly 10 employees on average. *Id.* It is not uncommon for a fab shop to be run with only a handful of employees. *Id.*

The value added by the fabrication process is less significant compared to the value of the QSP slab. *Id.* Almost two thirds of the cost of a fabricated product is directly related to the QSP slab that fabricated. *Id.*, Appx0891.

Finally, many fabricators rely on imported QSP slabs for their operations. *Id.* In fact, many of the fabricators that opposed initiation of the underlying investigation saw themselves as aligned with the "importers" instead of being part of the industry of domestic producers. Alan Jorgenson, the CEO of a an "importer/fabricator of quartz surfaces," circulated an open letter after the petitions were filed in which he stated:

> Our industry didn't come together strongly on the Chinese case. Many of you figured your businesses would be better off if imports were curtailed from China. But do you really think that shutting down China, India and Turkey and maybe Spain will benefit ***our industry of fabricators, importers and suppliers?***

*Id.*, Appx0891, Appx1001 (emphasis added). This letter made clear that fabricators did not have a stake in an investigation that would provide relief to domestic producers from the adverse effects of unfairly traded imports. Instead, the fabricators were allied with the importers that had an interest in continuing to rely on unfairly traded imports as part of their business operations.

## SUMMARY OF ARGUMENT

The statute is silent as to which entities qualify as "producers" for purposes calculating industry support. Commerce filled this gap by interpreting the term "producer" to mean a company that performs sufficient production-related activities in the United States such that it has a stake in the domestic industry. This interpretation is reasonable and should be upheld. In fact, the Court upheld this exact same interpretation of the statute in the case of *Eurodif S.A. v. United States*, 411 F.3d 1355 (Fed. Cir.), *aff'd on reh'g*, 423 F.3d 1275 (Fed. Cir. 2005).

MSI's attempts to distinguish this case from *Eurodif* based on factual differences between the two cases are completely unavailing. The factual differences on which MSI relies have no bearing on the legal question of whether Commerce's interpretation is reasonable under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). MSI's resort to dictionary definitions of the term "producer" do not show that the term unambiguously encompasses fabricators. These definitions instead show that the ordinary meaning of "producer" does not encompass fabricators, and at a minimum, they show that the term is ambiguous and calls for analysis under the second step of *Chevron* – *i.e.*, whether Commerce's interpretation is reasonable. In this regard, MSI has utterly failed to show that Commerce's interpretation is unreasonable. In fact, MSI concedes in its opening brief that Commerce's sufficient production-related activities test is an appropriate means to determine whether an entity is a "producer" under the statute.

MSI faces a demanding burden in challenging Commerce's determination as not being supported by substantial evidence – a burden MSI has failed to meet. At rock bottom, MSI's challenge is a

request that this Court reweigh the record evidence and reach a different determination than Commerce. This is no basis to overturn Commerce.

In addition, even if the Court had reason to demand that Commerce find that fabricators are producers, Commerce properly found that this result would not alter its decision to initiate the underlying investigation for two reasons. First, including the fabricators' volume of fabricated QSP in the calculation of industry support would result in double-counting of the QSP slabs made by producers such as Cambria. Second, even if the volume of fabrication that was opposed to the petitions were included in the calculation of industry support, there was still sufficient industry support under the statute to initiate the investigations.

Finally, as demonstrated in the final section of this brief, and as this Court has previously recognized, even assuming *arguendo* that there was insufficient industry support under the statute to require Commerce to initiate the underlying investigation, this would not mean that Commerce's investigation should be nullified. Commerce has

separate authority under the statute to self-initiate an antidumping investigation.

## ARGUMENT

### I. Commerce's Interpretation of the Term "Producer" Should Be Upheld

For a firm to have standing to file an antidumping petition, it must be a "manufacturer, producer, or wholesaler" of the domestic like product. 19 U.S.C. §§ 1673a(b)(1), 1677(9)(C). In addition, Commerce will determine that a petition has been filed on behalf of the domestic industry when: (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product; and (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition. 19 U.S.C. § 1673a(c)(4)(A). Here, consistent with its established practice, Commerce interpreted the term "producer" to mean an entity that performs sufficient production-related activities in the United States such that it has a stake in the domestic industry. Initiation Checklist at

Att. II, Appx1026. As demonstrated below, Commerce's interpretation of the statute is reasonable and should be upheld.

### A. Legal Standard

Because the issue before the Court is Commerce's statutory interpretation of the term "producer," the Court must conduct the two-step analysis under *Chevron* to determine whether Commerce's interpretation of the statute is in accordance with law. *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (citing *Chevron,* 467 U.S. at 842-43 (1984)). The first step of *Chevron* is to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* The Court reaches step two of *Chevron* only "if the statute is silent or ambiguous with respect to the specific issue." *Id.* Under the second step of *Chevron*, the Court must give deference to the agency's interpretation of the statute if it is "reasonable." *Id.*

The Federal Circuit has also noted that Commerce's "special expertise in administering the anti-dumping law entitles its decisions to

deference from the courts." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations omitted); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) ("Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws.") (citing *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)). In addition, the Supreme Court has held that where the agency is applying the antidumping statute, "we ask only whether the Department's application was reasonable." *United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009).

### B. Commerce Never Found That Fabricators Are Producers

As an initial matter, the Court should reject MSI's contention that, in interpreting the statute, Commerce explicitly found that fabricators are "producers" under the statute but then excluded them from the domestic industry on the basis that they did not perform sufficient production-related activities. *See, e.g.,* MSI Br. at 17 ("Commerce acknowledges that fabricators are 'producers,' a term with an unambiguous natural meaning."); *id.* at 21-22 ("Commerce erred by excluding fabricators (which Commerce acknowledged are producers of

the domestic like product) from its industry support calculations…”). This contention grossly mischaracterizes Commerce’s determination. Commerce did not find that fabricators are producers and then exclude them from the domestic industry. Rather, Commerce found that fabricators are not “producers,” and, as a result, are not part of the domestic industry. Commerce plainly stated that “fabricators do not perform sufficient production-related activities to qualify as domestic producers of quartz surface products.” Initiation Memo at 16, Appx1032.

MSI argues that legal counsel’s use of the term “production process” to refer to fabrication in its briefing at the CIT amounts to a concession that Commerce itself considered fabricators to be “producers.” MSI Br. at 9, 17. However, acknowledging that fabrication involves some amount of production-related activities is not a concession that fabricators are “producers” for purposes of determining industry support. Under Commerce’s interpretation of the statute, to qualify as a producer, a company cannot just perform “some” production-related activities. It must perform “sufficient” production-related activities such that it has a stake in the domestic industry.

MSI makes much ado about the fact that Commerce changed one reference to the fabricators' "production" in the investigation of QSP from China to the fabricators' "processing" in the investigation of QSP from India. *See* MSI Br. at 28. The fact that Commerce became more precise in the terminology it used to ensure greater accuracy in how it described fabricators' operations should not be held against the agency. *Huvis Corp. v. United States*, 570 F.3d 1347, 1355 (Fed. Cir. 2009) ("Improving accuracy is generally a good reason for a change in methodology.") (citations omitted). More importantly, the fact that Commerce made this change emphasizes that its determination rested on an explicit finding that fabricators are not "producers" under the statute. MSI's meritless contention to the contrary must be rejected.

### C. This Court Has Previously Upheld Commerce's Interpretation of the Term "Producer"

The courts have repeatedly recognized that the statute does not define the term "producer." *USEC Inc. v. United States*, 27 C.I.T. 489, 508 (2003) (recognizing that the term "producer" is not statutorily defined); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1346 (Ct. Int'l Trade 2017) (same); *Brother Indus. (USA), Inc. v. United States*, 801 F. Supp. 751, 757 (Ct. Int'l Trade 1992)

(same). Because the statute is silent with respect to the definition of "producer," the question for the Court is "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843.

In *Eurodif*, this Court upheld Commerce's interpretation of the term "producer" as being an entity with sufficient production-related activities such that it has a stake in the domestic industry in question. 411 F.3d at 1355. In that case, certain utility companies challenged Commerce's initiation of investigations on low enriched uranium ("LEU") because Commerce had excluded their opposition to the petitions, based on a finding that the utilities were not "producers." *Id.* at 1358. In assessing whether the utilities were "producers," Commerce applied the same "sufficient production-related activities" test that it applied in this case. *See* Commerce Final Remand Determination, *USEC Inc. v. United States* (June 23, 2003) at 3-4 ("USEC Remand"). On appeal, the utilities argued that Commerce's interpretation of the statute, based on this test, was erroneous. The Court rejected this challenge:

> Commerce's determination that domestic utilities were not "producers" of LEU is consistent with the purpose of § 1673a(c)(4)(A). Section 1673a(c)(4) speaks of "industry support" and, as expressed in legislative history, Congress intended the industry support statute "to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S. Rep. No. 249, 96th Cong., 1st Sess. 47 (1979). . . . Commerce interpreted having a "stake" as requiring that a company "perform some important or substantial manufacturing operation." . . . There is no basis to conclude that Commerce's interpretation in this context is unreasonable or not in accordance with law.

*Id.* at 1360-61. Commerce's interpretation of the statute in the underlying investigation in this case – which is identical to its interpretation of the statute in *Eurodif* – is thus reasonable and should be upheld.

### D. The Related Party Provisions of the Statute Have No Bearing on This Case

There is no merit to MSI's argument that Commerce erred in excluding fabricators from the calculation of industry support because the statute "establishes very limited instances in which the positions of U.S. producers of the domestic like product may be disregarded – (1) producers that are related to foreign producers, and (2) producers who are importers." MSI Br. at 32-33 (citing 19 U.S.C. § 1673a(c)(4)(B)). As MSI concedes, for Commerce to apply these statutory provisions, it

would first have to "recognize fabricators to be members of the domestic industry" and then exclude fabricators found to be importers. *Id.* at 33. Commerce's analysis never passed the first step in this process, because it never found fabricators to be members of the domestic industry.

For similar reasons, MSI's reliance on the canon of *expression unius est exclusion alterius* is unfounded. MSI Br. at 35. According to MSI, Congress's enumeration of two circumstances in which Commerce may exclude entities that have been found to be "producers" from the domestic industry under the related party provisions of the statute means that Congress did not authorize Commerce to exclude producers under the sufficient production-related activities test. *See* MSI Br. at 35 (citing *King v. Briggs*, 83 F.3d 1384 (Fed. Cir. 1996)). Again, Commerce did not find fabricators to be producers and then exclude them from the domestic industry. It found that fabricators are not producers. As the CIT explained below when addressing these arguments:

> MSI … misses a step: 19 U.S.C. § 1673a(c)(4)(B) applies to those parties considered "producers" of the domestic like product and prescribes limited circumstances for exclusion of their opinions. The statute does not address if or how Commerce should consider the opinions of parties that Commerce finds are not "producers" of the relevant domestic

> like product. MSI's reliance on § 1673a(c)(4)(B) is therefore misplaced.

Slip Op. at 9, Appx0025.

MSI's only answer to this inescapable logic is its insistence that Commerce actually "considered the fabricators to be producers" but "inserted into the statute an extra step comprised of a double filter of exclusion based on import operations." MSI Br. at 38. This is utter nonsense. Commerce explicitly stated when initiating the investigation that "fabricators do not perform sufficient production-related activities to qualify as domestic producers of quartz surface products." Commerce Initiation Memo (May 29, 2019) at 16, Appx1032. The notion that Commerce considered fabricators to be producers has no grounding in the record or in fact.

### E. The Court's Decision in *Eurodif* Is Binding Precedent on the Interpretation of the Statute

As discussed above, in *Eurodif* this Court upheld Commerce's interpretation of the term "producer" as being an entity with sufficient production-related activities such that it has a "stake" in the domestic industry in question. 411 F.3d at 1361. Commerce interpreted the term "producer" in the exact same manner in the underlying investigation in

this case. The Court's decision in *Eurodif* thus represents binding precedent on this issue that should be followed. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139, (2008) ("*stare decisis* in respect to statutory interpretation has 'special force,' for 'Congress remains free to alter what we have done.'") (citation omitted). MSI has offered no reason for the Court to revisit this issue other than its disagreement with how *Eurodif* was originally decided. However, "the very point of *stare decisis* is to forbid {the Court} from revisiting a debate every time there are reasonable arguments to be made on both sides." *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1283 (Fed. Cir. 2014) (en banc), *abrogated by Teva Pharm. USA, Inc. v. Sandoz*, Inc., 574 U.S. 318 (2015) (citation omitted).

MSI's attempts to distinguish this case from *Eurodif* are baseless and should be rejected. MSI argues that *Eurodif*'s holding does not apply to this case because of "the factual contrast" between the utilities in *Eurodif* and the fabricators in this case. *See* MSI Br. at 40. The utilities in *Eurodif* were toll producers that contracted other enrichment companies to perform all of the LEU manufacturing operations on their behalf. *Id.* (citing *Low Enriched Uranium From*

*France*, 66 Fed. Reg. 65,877 (Dep't of Commerce Dec. 21, 2001). Any differences in the facts between *Eurodif* and this case may be relevant to whether Commerce's determination is supported by substantial evidence. However, the fact that the utilities in *Eurodif* may have performed less production-related activities than the fabricators in this case has no bearing on whether Commerce's interpretation of the term "producer" in the statute is reasonable.

MSI mischaracterizes *Eurodif* when it states that, unlike the fabricators in this case, the utilities did not argue that they qualified as "producers" under the governing statute but instead argued that "their purchaser views mattered for industry support purposes because they were producers under Commerce's now revised tolling regulations…." *See* MSI Br. at 41 (citing *Eurodif*, 411 F.3d at 1360). In *Eurodif*, the utilities did, in fact, argue that they were "producers" under the statute, and they did so based on their claim that Commerce should apply its tolling regulation to interpret the term "producer." 411 F.3d at 1360. The tolling regulation at that time, which applied in the context of determining export price, stated that Commerce would consider a company that provides toll manufacturing services to be a

"manufacturer" or "producer" only if it acquired ownership and controlled the relevant sale of the subject merchandise. *Id.* (citing 19 C.F.R. § 351.401(h) (2004)). The utilities argued that under the tolling regulation, the foreign enrichment companies in France were not the "producers" of the LEU because the utilities retained title and control of the subject merchandise throughout the manufacturing process. *Id.* The utilities further argued that, because they controlled virtually all aspects of the manufacturing process, the utilities themselves were "producers." *Id.* The bottom line is that, like the fabricators in this case, the utilities argued that they were "producers" under 19 U.S.C. § 1673a(c)(4)(A) based on their manufacturing activities. In both cases, however, Commerce found that the entities opposed to the petitions did not perform sufficient manufacturing activities in the United States to qualify as "producers."

Further contrary to MSI's claims, the legislative history examined by *Eurodif* does not support MSI's position here. MSI Br. at 42. In *Eurodif*, the Court explained that "Congress intended the industry support statute 'to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake

in the result of the investigation." *Eurodif*, 411 F.3d at 1360 (quoting S. Rep. No. 96-249, at 47 (1979)). According to MSI, the fact that fabricators could be negatively impacted by the imposition of antidumping duties through the filing of the petitions meant they had a "stake" in the result of the investigation that qualified them as "producers." However, this is not the kind of "stake" that Congress was contemplating in the legislative history of the statute. Indeed, MSI's interpretation would lead to absurd results. Any party impacted by a petition, from importers to customers, would have a "stake" and be considered a "producer" under the statute, a result clearly contrary to Congress intentions in limiting the parties considered under 19 U.S.C. § 1673a(c)(4)(A). MSI's interpretation would dictate that the utilities in *Eurodif* be treated as "producers" because they had a stake in continuing to access imports of low enriched uranium instead of purchasing it from the domestic producers, an outcome explicitly rejected by the Court. *See USEC Inc. v. United States*, 27 C.I.T. 1419, 1433 (2003) ("we acknowledge that in this case, the utilities would benefit from, rather than be injured by, the availability of lower-priced

LEU or enrichment services provided by foreign companies"), *aff'd in part, rev'd in part sub nom., Eurodif*, 411 F.3d at 1355.

As the Court explained in *Eurodif*, "{t}he language in the legislative history is broad and unqualified. It contrasts industries suffering *adverse effect* with those having *no stake*: the former have standing, the latter do not." *Id.* at 1360-61 (quoting *Brother Indus. (USA), Inc. v. United States,* 801 F.Supp. 751, 757 (Ct. Int'l Trade 1992)) (emphasis added). Thus, the fabricators' interest in the result of the investigation on QSP from India does not compel the inclusion of fabricators in the domestic industry. Indeed, the fabricators' interest is almost identical to the utilities in *Eurodif* that opposed the initiation of investigations on LEU from France, because the fabricators would benefit from, rather than suffer an adverse effect from, unfairly traded imports of QSP from India. In both cases, Commerce properly found that such parties do not qualify as "producers" for purposes of determining industry standing under the statute.

### F. The Statute Is Silent Regarding the Term "Producer," Requiring an Analysis Under Step Two of *Chevron*

As discussed above, the courts have repeatedly recognized that the statute does not define the term "producer." *USEC*, 27 C.I.T. at 508;

*Shandong*, 203 F. Supp. 3d at 1346; *Brother Indus.*, 801 F. Supp. at 757. As a result, the interpretation of this term is subject to the second step of the *Chevron* analysis – *i.e.*, whether Commerce's interpretation is a reasonable one. Indeed, in *Eurodif*, this Court analyzed Commerce's interpretation of the term "producer" under the second step of *Chevron*, thus recognizing that the term was ambiguous as to this issue. 411 F.3d at 1360 (upholding Commerce's interpretation of the term "producer" as "reasonable and, thus, in accordance with law").

The Court should reject MSI's argument that the absence of a definition in the statute for the term "producer" did not leave a gap for Commerce to fill with a reasonable interpretation as the "ordinary or natural meaning" of the term clearly encompasses fabricators. *See* MSI Br. at 30. It is true that "{i}n the absence of an express definition, we presume that Congress intended to give those words their plain and ordinary meanings." *Gazelle v. Shulkin*, 868 F.3d 1006, 1010–11 (Fed. Cir. 2017). "But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory

scheme." *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1290 (Fed. Cir. 2015) (quoting *King v. Burwell*, 576 U.S. 473 , 486, 135 S. Ct. 2480, 2489, 192 L. Ed. 2d 483 (2015) (internal quotation marks omitted)). Here, when read in context with a view as to purpose of the trade remedy laws, it was reasonable for Commerce to interpret the term "producer" to mean an entity with sufficient production-related activities such that it would have a stake in the domestic industry.

MSI's resort to the ordinary meaning of "producer" as defined in various dictionaries does not resolve the problem faced by Commerce when determining whether fabricators are producers. *See* MSI Br. at 31. In fact, if anything, it supports Commerce's determination that fabricators are not producers:

- The *Oxford English Dictionary* defines "produce" as "to make or manufacture (a product or commodity) from components or raw materials." *Id.* at 31. Fabricators do not "make or manufacture" QSP from components or raw materials. They take an existing product and cut it to the dimensions needed for installation.

- *Merriam-Webster* defines "producer" as one that "manufactures crude materials into articles of use." *Id.* This raises the question of whether fabricators use "crude materials" when they process finished QSP slabs. *Merriam-Webster* defines "crude" as "existing

in a natural state and unaltered by cooking or processing."[1] Under this definition, Cambria is a producer because it manufactures crude materials such as quartz powder into QSP slabs that can be used as countertops. Fabricators, in contrast, take an existing article of use (*i.e.*, a QSP slab) and prepare it for installation.

- The *Cambridge Dictionary* defines "produce" as "to make something or bring something into existence."[2] QSP slab producers such as Cambria make or bring QSP into existence. Fabricators take QSP, marble, or granite that already exists and cut it to the dimensions required for installation.

- The *Oxford English Dictionary* defines "fabricate" as to "construct or manufacture (an industrial product), especially from prepared components."[3] Similarly, *Merriam-Webster* defines "fabricate" as "to construct from diverse and usually standardized parts."[4] Thus, to "fabricate" involves processing and assembling "components" or "standardized parts" that were already produced by another entity. It does not involve "producing" anything new.

Significantly, there is no dispute that the record shows that the QSP industry consistently refers to companies like Cambria as "producers" or "manufacturers" of QSP but refers to companies that cut

---

[1] *Crude, Merriam-Webster Dictionary*, https://www.merriam-webster.com (last visited March 15, 2022).

[2] *Produce, Cambridge Dictionary*, https://dictionary.cambridge.org (last visited March 15, 2022).

[3] *Fabricate, Oxford English Dictionary*, https://www.oed.com (last visited March 15, 2022).

[4] *Fabricate, Merriam-Webster Dictionary*, https://www.merriam-webster.com (last visited March 15, 2022).

QSP slabs for installation as "fabricators." *See, e.g.,* APPX0158 (referring to Cambria as a "producer" of QSP and to entities that purchase QSP as "distributors, fabricators, and/or installers"); APPX0341-342 (referring to the Indian QSP slab producer Pokarna as a "manufacturer" and to Pokarna's customers as "fabricators"). The fabricators that joined MSI in opposing the petitions described their own operations as [ DESCRIPTION OF FABRICATOR OPERATIONS ]. MSI Standing Challenge at 6, Ex. 6, Appx0396, Appx0546-0826. There is thus widespread consensus in the industry that the ordinary meaning of the term "producer" does not encompass fabricators.

Furthermore, fabricators do not just cut and process QSP. They also cut and process materials such as granite, marble, and other surface products. Under MSI's proffered definition of "producer," fabricators are not only QSP producers but also granite producers, marble producers, and producers of the entire range of surface products, managing to "produce" all these different products through the same cutting activities.

The bottom line is that the ordinary meaning of the term "producer" does not encompass fabricators but only applies to QSP slab

producers such as Cambria. At a minimum, however, resort to the ordinary meaning of the term "producer" does not resolve this issue. There is ambiguity in how the term "producer" should be interpreted when deciding whether a particular entity is a producer for purposes of determining industry support. MSI points to no dictionary definition of the term "producer" that declares precisely that both producers and fabricators of QSP are considered producers, leaving the question one of interpretation of the general term on the specific facts in question. As a result, the question of whether Commerce's interpretation should be upheld must be answered under the second step under *Chevron*.

### G. MSI Has Failed to Demonstrate Under Step Two of *Chevron* That Commerce's Interpretation of the Statute Is Unreasonable

MSI has not offered any arguments as to why Commerce's interpretation of the statute is unreasonable. Rather, virtually all of MSI's arguments are based on the premise that the plain language of the statute unambiguously requires Commerce to treat fabricators as producers for purposes of determining industry support. Because the statute is ambiguous, all of MSI's arguments are based on an invalid premise. They must, therefore, be rejected.

To the extent that MSI addresses the reasonableness of Commerce's interpretation of the statute, it actually concedes that the use of a sufficient production-related activities test is reasonable. In particular, MSI states the following:

> MSI is not arguing that there are no situations in which Commerce could deploy the sufficient production-related activities analysis. For example, Commerce may question whether an entity is a producer if it simply painted the QSP, and the sufficient production-related activities test may assist with that analysis.

MSI Br. at 25, n.25.[5] In other words, MSI agrees there are entities that perform some production-related activities with respect to QSP — such as painting — that nevertheless are not "producers" because they do not perform sufficient production-related activities.[6] MSI simply disagrees

---

[5] MSI clarifies that its argument on appeal is that the use of the sufficient production-related activities test in this case was inconsistent with the statute because fabricators are already "acknowledged producers." *See* MSI Br. at 25, n.25. This only begs the question of when an entity performs sufficient production-related activities such that it is an "acknowledged producer" that would be exempt from the sufficient production-related activities test.

[6] Put another way, MSI recognizes that, when interpreting the term "producer," a line must be drawn somewhere between entities that merely "process" QSP and those that actually "produce" QSP. This Court has recognized that this type of "line-drawing" exercise is precisely the type of task that should be left to the agency's

with Commerce's application of that test to determine that fabricators are not "producers."

At the end of the day, there is no question of statutory interpretation for the Court to decide. As discussed above, there is ambiguity in the statute that must be resolved, and thus the analysis of Commerce's interpretation of the term "producer" must proceed under the second step of *Chevron*. Under the second step of *Chevron*, MSI concedes that Commerce's interpretation of the statute is reasonable. Thus, the only real question before the Court is whether substantial evidence supports Commerce's determination based on its sufficient production-related activities analysis. It does.

## II. Commerce's Determination That Fabricators Are Not Producers Is Supported by Substantial Evidence

In its notice of initiation, Commerce applied its production-related activities test to determine that fabricators are not "producers" for purposes of calculating industry support. *See* Initiation Checklist at Att. II, Appx1020-1034. As discussed below, the Court should reject MSI's

---

discretion. *Haggar Apparel Co. v. United States*, 222 F.3d 1337, 1341-42 (Fed. Cir. 2000).

arguments that this determination was not supported by substantial evidence.

### A. Legal Standard

This Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Court has previously recognized that, when an appellant pursues an argument that Commerce's determination is not supported by substantial evidence, it "has chosen a course with a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) (additional citation omitted). The conclusion reached by Commerce need not be the only one possible from the record, for "{e}ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

When performing a substantial evidence review, the Court has stated that "we give great weight to 'the informed opinion of the {CIT}.' Indeed, it is nearly always the starting point of our analysis." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006), (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed.Cir.1994)).

**B. Commerce Analyzed All of the Record Evidence and Arguments Raised by MSI**

As the CIT found below, MSI's evidentiary challenge to Commerce's determination that fabricators are not producers is, in actuality, a request that the Court reweigh the evidence and reach a different conclusion. Slip Op. at 15, Appx0031. This Court has repeatedly recognized that such requests are not a valid basis to overturn an agency's determination based on substantial evidence review. *See, e.g., Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 998 (Fed. Cir. 2020) ("In general, Stratus's arguments effectively ask us to reweigh the evidence considered by the Board. That is not the role of this court. Instead, we evaluate whether the Board's factual findings for each considered DuPont factor are supported by

substantial evidence."); *see also Sunpreme Inc. v. United States*, 946 F.3d 1300, 1310 (Fed. Cir. 2020).

Furthermore, there is no basis for MSI's contention that Commerce did not "engage" with the evidence that MSI submitted in its standing challenge. MSI Br. at 12. Commerce's initiation memorandum shows that the agency acknowledged, analyzed, and addressed all of the arguments and evidence submitted by MSI in its challenge. Initiation Checklist at Att. II, pp. 9-15, Appx1025-1031. Just as Commerce did not exhaustively discuss each piece of evidence submitted by Cambria, the agency did not dissect every iota of evidence submitted by MSI. *See id.* However, the "substantial evidence" standard does not impose such a demanding and unrealistic burden on the agency. "Commerce is not 'required to explicitly address every piece of evidence presented by the parties,' but only 'significant arguments and evidence which seriously undermines its reasoning and conclusions.'" *Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1317 (Ct. Int'l Trade 2020) (quoting *U.S. Steel Corp. v. United States*, 36 C.I.T. 1172, 1174 (2012)). Indeed, as the CIT found, MSI has been "unable to point to anything other than Commerce's adverse finding that fabricators are not

'producers' as evidence of Commerce's alleged failure to consider the evidence." APPX0030.

MSI also takes issue with Commerce for not addressing certain arguments that it made in its case brief prior to the final determination. MSI Br. at 14-15. There arguments are largely duplicative of arguments that MSI raised in its standing objection prior to initiation. *See* MSI Case Brief (Mar. 27, 2020) at 10, Appx1848. In any event, "Commerce is prohibited from reconsidering industry support after the initiation of an investigation." *P.T. Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1323 (Ct. Int'l Trade 2012) (citing 19 U.S.C. § 1673a(c)(4)(E)). Thus, to the extent there was anything novel in the arguments that MSI raised in its case brief, Commerce could not have reversed its industry support finding in the final determination based on these arguments.

### C. The Court Should Dismiss MSI's Attempts to Minimize the Evidence Regarding Fabricators' Minimal Production-Related Activities

The Court should reject MSI's attempts to minimize the evidence supporting Commerce's determination that fabricators are not producers because they do not perform sufficient production-related

activities. *See* MSI Br. at 45-47. In its moving brief, MSI prepared a chart that characterizes in a superficial and misleading way the exhibits that Cambria submitted in its response to MSI's standing challenge. *Id.* The CIT correctly found that MSI's purported explanations as to why each exhibit does not support Commerce's findings simply "challenge the weight assigned to that evidence" but fail to show that MSI's "preferred alternative was the one and only reasonable finding that could be reached on the record." APPX0031. In fact, as demonstrated below, each of these exhibits supported Commerce's determination.

In Exhibit 2 of its response, Cambria submitted an affidavit from Brian Scoggin, the Executive Vice President of Operations at Cambria who is responsible for operations both at the company's production plant and its fabrication facilities, who thus has expertise regarding both QSP slab production and the fabrication process. CSR at Ex. 2, Appx0940-0943. This affidavit provided evidence relevant to each of the factors that Commerce analyzes as part of its production-related activities test. *Id.* In particular, the affidavit demonstrated that:

- The capital investment required to establish a slab production plant is many multiples of the investment required to establish a fabrication shop. Cambria's slab plant required hundreds of millions of dollars of investment. Cambria's fabrication shop, which is large and relatively sophisticated compared to a typical fabrication shop, required only several million dollars. *Id.*

- The technical expertise for QSP slab production is much greater than that required for fabrication. Slab production involves larger and more complex equipment; knowledge of the specific raw materials, chemistry, recipes, and processes required to produce different designs of slabs; and highly technical engineers. In contrast, fabrication involves tools for cutting and polishing stone that are not specific to QSP but can also be used on other materials such as marble, granite, or even wood. *Id.*

- There are far more employees required to produce a QSP slab than to fabricate one. Cambria employed over 600 full time employees in its slab production plant, while its related fabrication shops employ about 70 employees on average.

- The value added by fabrication is less significant than the value of the QSP slab, with almost two thirds of the cost of a fabricated product being directly related to the slab. *Id.*

- QSP production plants and the equipment they use are dedicated solely to the production of QSP. In contrast, fabrication shops can fabricate any type of stone slab of any origin – whether QSP or granite, whether domestic or imported. *Id.*

- QSP slab producers invest significant resources in research and development to create new designs in quartz surface products, which have been an important factor in growing demand for QSP. In contrast, fabrication shops fabricate the offerings developed and produced at the QSP plant as well as other types of stone surfaces. *Id.*

The other exhibits relied on by Commerce provide additional evidence supporting its determination. Exhibit 3 shows that Caesarstone, a second domestic producer of QSP, invested $70 to $100 million to establish a new QSP slab plant. *See* Appx0945. Exhibit 4 shows that LG Hausys, a third domestic producer of QSP, invested $50 million for its first slab production line and $40 million to establish a second one. *See* Appx0949, Appx0952. Exhibit 5 shows that a typical fab shop can be established for as little as $50,000 to $100,000. *See* Appx0955-0956. Exhibit 6 depicts the large and complex equipment included in a QSP slab production line. *See* Appx0970. Exhibit 7 discusses the business operations of a successful fabrication business, the relatively simple equipment that it uses, the smaller number of workers employed, and the sources of the different surfaces that are fabricated, which include many imported products. *See* Appx0972-975. Exhibit 8 shows how slab producers provide fabricators with manuals containing step-by-step instructions on how to fabricate their product, and that these manuals tend to focus as much on measuring and installing QSP as they do on the actual fabrication process. *See* Appx0978-0982. Finally, Exhibit 9 shows how the fabricators who

opposed the petitions saw themselves as part of an alliance of "importers" instead of part of a domestic industry with manufacturing operations in the United States. *See* Appx1001.

MSI repeatedly takes issue with Commerce's observation that "many fabricators rely on imported slabs to produce final fabricated products." MSI Br. at 10, 33, 34. However, this fact is relevant to the question of whether fabricators should be considered *domestic* producers. Consistent with Congress's intent, Commerce has determined for industry support purposes "that in order to be a producer, an entity must have a 'stake' in the domestic industry in question." *Eurodif*, 411 F.3d at 1360. Thus, among many other relevant factors, Commerce may examine the extent of a company's imports of the domestic like product to determine if it is a "producer" in the first place. *See* USEC Remand at 3-4. Here, every single fabricator included in MSI's standing objection stated that it opposed the petition because it had [ DESCRIPTION OF REASON FOR OPPOSING PETITION ]. MSI Standing Challenge at Ex. 6 Appx0396, Appx0546-0826. Furthermore, while the stock affidavit provided by MSI did not prompt the fabricators to disclose if they are importers many fabricators had

the term [ CONFIDENTIAL TERM ]. *Id.* One of the largest fabricators to join MSI in its objection to standing, [ NAME ], described its operations as follows: [ DESCRIPTION OF OPERATIONS OF FABRICATOR ]. *Id.*, Appx0637 (emphasis added). It is thus no wonder that the fabricators aligned with MSI were opposed to the petitions. They had a [ CONFIDENTIAL TERM ] stake in importing QSP – not a stake in the domestic industry producing QSP.

The bottom line is that there was compelling evidence on the record supporting Commerce's determination that fabricators do not perform sufficient production-related activities to be producers for purposes of determining industry support. MSI's attempts to minimize the weight and significance of this evidence should be rejected.

### D. Commerce and the Commission Can Reach Separate Determinations on Related Issues

MSI contends that the Commission's finding that fabricators are part of the domestic industry for assessing material injury "weakens" Commerce's finding that fabricators are not part of the domestic industry for calculating industry support. MSI Br. at 50. However, this Court has repeatedly recognized that Commerce and the Commission may "reach distinct decisions on the same or similar issues based on

their separate responsibilities under the statute." *See Asociacion Colombiana de Exportadores de Flores v. United States*, 693 F. Supp. 1165, 1168 n.4 (Ct. Int'l Trade 1988) ("For administrative ease and to avoid complications it would be helpful if the decisions of ITC and ITA were coterminous, but they are separate decisions that ultimately are made on separate bases."); *Hosiden Corp. v. Advanced Display Mfrs. Of America*, 85 F.3d 1561 (Fed. Cir. 1996) ("The division of responsibility between the Commission and Commerce is integral to the statutory scheme" and this "division of labor has been upheld even where it has resulted in decisions which are difficult to reconcile . . . .") (citation omitted); *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1584-85 (Fed. Cir. 1990) (affirming Commerce determination to define industry more broadly than ITC for differing purposes); *Torrington Co. v. United States*, 14 C.I.T. 648, 650, (1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) (explaining that the two agencies reaching different conclusions is not unanticipated under the law); *Algoma Steel Corp. v. United States*, 12 C.I.T. 518 (1988), *aff'd*, 865 F.2d 240 (Fed. Cir.), *cert. denied,* 492 U.S. 919 (1989) ("This division of labor has been upheld even where it has resulted in decisions which are difficult to reconcile

…”). In affirming the CIT’s decision in *Algoma*, the Federal Circuit stated that the relationship between the Commission and Commerce “should be one for the agencies to resolve between themselves, and not for the courts.” 865 F.2d at 241.

As shown in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (“SAA”), Congress contemplated that Commerce and the Commission could reach different decisions regarding which entities should be part of the domestic industry. Specifically, in discussing the definition of related parties in Section 771(4)(B) of the Act, the SAA states:

> In this regard, Commerce and the Commission utilize section 771(4)(B) for different purposes: Commerce to eliminate any conflicts of interest that may distort its consideration of the level of industry support for an antidumping or countervailing duty petition, and the Commission to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports. For this reason, each agency will have discretion to apply this provision to accomplish these different purposes, even where this may lead to somewhat different results in individual cases.

SAA, H.R. Doc. No. 103-316 (1994) at 858. While this discussion pertains to the agencies’ application of the related party provisions of the statute, the same rationale applies equally to the agencies’

interpretation of the term "producer" to determine whether a company is part of the domestic industry. Commerce interprets the term "producer" with the goal of ensuring that only entities with a stake in the domestic industry are treated as producers. The Commission interprets the term "producer" with the goal of accurately assessing whether the domestic industry has suffered material injury by reason of subject imports. These different goals can lead to different results in individual cases.

In addition, as the CIT explained, MSI's argument regarding the Commission's determination involves a "chronological fallacy," because "for Commerce to rely on the {Commission's} fact findings, Commerce would have to know the {Commission's} determination before reaching its own conclusions {and} it is only after Commerce determines industry support and decides to initiate an investigation that Commerce then notifies the {Commission} of its decision." Slip Op. at 17, Appx0033. MSI argues that the CIT is incorrect on this point because "Commerce had an important clue" that the Commission may find that fabricators are part of the domestic industry as the Commission "had already issued U.S. producers' questionnaires to fabricators." MSI Br. at 53. The

issuance of these questionnaires did not predetermine that the Commission would find that fabricators are part of the domestic industry. One reason the Commission issued the questionnaires was to gather information from fabricators to determine whether they should be part of the domestic industry. *See* Appx0436 (requesting information relevant to the six factors of the production-related activities test to aid the Commission's assessment as to whether fabricators are producers). Thus, contrary to MSI's arguments, it was reasonable for Commerce to rely on the Commission's preliminary determination that fabricators are not part of the domestic industry, because Commerce did not have a crystal ball foretelling that the Commission would ultimately reach a different finding in its final determination than it reached in its preliminary determination.[7]

---

[7] MSI accuses Cambria of filing the petitions on QSP from India prior to the conclusion of the investigations on QSP from China because the Commission "had signaled that it would treat fabricators as domestic producers in the ongoing QSPs from China final injury investigation." MSI Br. at 8. Cambria filed the petitions on QSP from India because imports from India had surged by over 170 percent from 4.1 million sq. ft. in 2016 to 11.1 million sq. ft. in 2018. *See* Petitions at 20, Appx0078. This was certainly not the first instance where a petitioner filed cases against unfairly traded imports from China, received relief, and then was later forced to bring cases

Finally, to the extent that the Commission's final determination is relevant to Commerce's determination of industry support—even though chronologically it was issued after Commerce's determination—it is significant that only two fabricators actually submitted responses to the Commission's U.S. producer's questionnaire. *See* USITC Pub. 5061 at 3-4. This lack of participation as U.S. producers shows that fabricators had no "stake" in the domestic industry. Their sole interest lay in opposing the petitions so that they could continue to access the unfairly traded imports that were having an adverse effect on the actual domestic industry.

### E. There Was No Reason for Commerce to Extend the Deadline for Initiation

MSI also suggests that Commerce should have extended the initiation deadline to gather additional evidence regarding the

---

against additional countries. *Id.* at 16, Appx0074. This case was unique, however, in the speed at which imports from India replaced imports from China after preliminary relief was provided against China. *Id.* Cambria filed the petitions on QSP from India prior to the conclusion of the investigations on QSP from China so that it would not be deprived of the opportunity to benefit from the relief on QSP from China. *Id.* at 17, Appx0075.

composition of the domestic industry. MSI Br. 54-55. However, there was no need to extend the deadline because Commerce already had all the evidence it needed to make a determination with respect to industry support. *See* Initiation Memorandum at Att. II, Appx1035-1036.

The legislative history cited by MSI does not support its argument that Commerce should have extended the deadline for initiation. To the contrary, the legislative history shows that Congress intended for the standing requirement to be interpreted liberally in support of a finding of industry support, that Commerce should initiate investigations as expeditiously as possible, and that Commerce should only extend the deadline for initiation to avoid *negative* initiation determinations:

> The Administration expects that, in the vast majority of cases, the determination of industry support will be made within the initial twenty-day period. The ability to extend the initiation determination will avoid negative initiation determinations simply because Commerce was unable to gather the required support information in twenty days. The Administration intends that Commerce will use this extension authority only in exceptional circumstances where the industry support issue cannot be decided in twenty days, and the initiation determination will be extended only for the additional time necessary to make a determination regarding industry support.

SAA, H.R. Doc. No. 103-316 (1994) at 863. Thus, Commerce was following both the letter and the spirit of the law when it declined to

extend the deadline for initiation to gather additional information regarding industry support. The agency had all the information it needed to initiate, and there was no reason to delay the proceedings.

## III. Even If Fabricators Are Producers, Commerce's Initiation of the Investigation Should Be Upheld

As discussed above, Commerce's determination that fabricators are not producers is supported by substantial evidence and in accordance with law. However, even assuming *arguendo* that fabricators are producers, Commerce's decision to initiate the underlying investigation should still be upheld.

### A. Including Fabricators in the Calculation of Industry Support Would Result in Double-Counting

Fabricators cut preexisting QSP slabs into the final dimensions required for installation. Thus, as Commerce found in its initiation memorandum, because its industry support calculation already accounted for all the QSP slabs produced in the United States, it necessarily included the total volume of domestic QSP that was then fabricated in the United States. Initiation Memorandum at Att. 2, Appx1032. Adding the volume of QSP slabs that was fabricated by the fabricators into the calculation would result in double counting of the

same QSP slabs. *See id.* To the extent that fabricators were fabricating QSP slabs made in the United States, this volume of QSP would already be accounted for in the production volumes reported by the domestic producers. To the extent that fabricators were fabricating QSP slabs that were imported, this volume of QSP could not be counted towards production of the *domestic* like product, because the country of origin of the QSP does not change due to fabrication. *See* Customs Ruling N101559 (May 10, 2010), 2010 WL 2152621 (ruling that the country of origin of QSP slabs produced in Korea remains Korea after fabrication in the United States, because no substantial transformation takes place through fabrication); Customs Ruling H303280 (Apr. 25, 2019), 2019 WL 2345751 (ruling that the United States is the country of origin of QSP slabs produced in the United States, exported to China for fabrication, and then reimported into the United States).

Although it reached a different conclusion on the question of whether fabricators are producers, the Commission recognized that including the fabricators' shipments of fabricated QSP as well as the production of that domestic QSP would result in double counting of the same merchandise, in its the calculation of apparent consumption in the

United States. *See* USITC Pub. 5061 at C-4. ("Since independent fabricators' U.S. shipments are already reported once either in U.S. producers' U.S. shipments or as an imported quartz surface product, they are not added into the calculation of overall apparent U.S. consumption so as to avoid double-counting the same merchandise."). This approach is also consistent with the Commission's methodology in past cases in which the domestic industry included both upstream producers and downstream processors. *See, e.g., Thermal Paper from Germany, Japan, Korea, and Spain*, Inv. Nos. 731-TA-1546-1549 (Final) USITC Pub. 5237 (Nov. 2021) at 35, III-24 (applying same methodology); *Polytetrafluoroethylene Resin from China and India*, Inv. Nos. 701-TA-588 and 731-TA-1392-1393 (Final), USITC Pub. 4801 (July 2018) at 25, 28, 32-33 (same).

In short, even if fabricators are treated as producers, Commerce would still have to exclude the volume of QSP that they fabricated from the calculation of industry support to avoid double counting. As a result, treating fabricators as producers would not result in a lack of industry support for the petition.

### B. Even If Fabricators Are Included in the Calculation of Industry Support, There Was Still Sufficient Support for the Petitions

And Commerce further found that even if the fabricators are treated as producers, and even if their fabrication volume is included in the calculation of industry support, there would still be the requisite industry support for Commerce to initiate the underlying investigation. Initiation Checklist, Att. II, pg. 16, n.129, Appx1032. MSI's standing challenge included 11,913,520 square feet of fabrication from the fabricators who opposed the petition. *Id.* When Commerce calculated industry support based on both the fabrication quantity in MSI's challenge and the production quantity in Cambria's petition, the domestic producers who supported the petition still accounted for [ >50 ] percent of total U.S. production (including fabricators) and [ >50 ] percent of U.S. production by those producers (including fabricators) expressing support for, or opposition to, the petition. *Id.* Thus, even assuming that Commerce should have included the fabricators' opposition in the calculation of industry support, there was still sufficient support for the petitions to initiate the investigation. This

fact provides a separate and independent basis to uphold Commerce's decision to initiate the investigation.

Addressing this alternative basis for upholding Commerce's initiation, MSI argues that Commerce "incorrectly assumed that, in collecting the views of 270 fabricators, MSI had provided the views of the entire universe of U.S. fabricators." MSI Br. at 14. MSI claims that the 270 fabricators accounted for only a small percentage of the 10,000 fabricators in the United States and that, as a result, Commerce's alternative calculation of industry support "disregarded the views of almost 10,000 fabricators." *Id.*

The Court should reject MSI's belated attempts to establish additional fabrication of QSP that was opposed to the petitions. First of all, this claim was never raised before Commerce. *See generally* MSI Standing Challenge, Appx0391-0398. It is, therefore, waived. *Consol. Bearings Co. v. United States,* 348 F.3d 997, 1003 (Fed. Cir. 2003) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies" and "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted") (citations omitted).

Second, even if properly raised, there is no substantial evidence on the record corroborating MSI's claim of an additional 10,000 fabricators. Indeed, to support its claim, MSI points to a single sentence in the Commission's preliminary determination in QSP from China, where the Commission staff stated that "{a}ccording to a small, independent fabricator, there are over 10,000 fabricators in operation in the United States." *See* MSI Br. at 14 (citing Petitions at Ex. I-6, p. I-13, Appx0168). This is a far cry from "substantial evidence."

Third, assuming that there are 10,000 fabricators, MSI failed to provide any evidence regarding the volume of additional QSP fabrication performed by the fabricators that were not part of MSI's standing challenge. In this regard, MSI has the statute backwards when it suggests that Commerce needed to poll the industry to determine the total production of QSP so that the agency could then determine whether the statute required it to poll the industry to establish industry support. *See* MSI Br. at 8, 23. The statute requires that Commerce poll the industry only if the petition does not establish support of domestic producers accounting for more than 50 percent of the total production of the domestic like product. 19 U.S.C. §

1673a(c)(4)(D). The petitions and other evidence submitted on the record by Cambria and MSI established that this 50 percent threshold *was* met, *even* when the volume of the fabricators in opposition to the petition was included in the calculation. If MSI believed there was additional fabrication volume that opposed the petitions, MSI needed to develop the record further by submitting additional evidence on this issue. When it failed to do so, it could not then demand that Commerce poll the industry in the hope that Commerce would produce the evidence that MSI failed to produce.

## IV. Even If Industry Support Was Lacking, Commerce Had Authority to Self-Initiate Investigations

Even if the Court were to find that there was insufficient industry support at the time of the filing of the petitions, there would still be no need for a remand to Commerce, because Commerce has the authority to initiate an antidumping investigation *sua sponte* whenever it has reason to believe that unfairly traded imports are causing material injury to a domestic industry. *See* 19 U.S.C. § 1673a(a)(1). For example, in *Citrosuco Paulista, S.A. v. United States*, the CIT held that once Commerce has determined to initiate an antidumping investigation, even where there may have been a defect in standing at the time of the

filing of the petition, it would "elevate{} form over substance" to require Commerce to dismiss the petition and then require the domestic industry to file a new petition to achieve the same result. 704 F. Supp. 1075, 1083 (Ct. Int'l Trade 1988). There, a group of processors challenged Commerce's decision to initiate an antidumping duty investigation on frozen concentrated orange juice from Brazil on the basis that the petitioners were not producers of the domestic like product but were instead producers of oranges for processing into orange juice. After the petitions were filed, Commerce allowed the addition of other domestic producers of orange juice as co-petitioners and proceeded to initiate an antidumping investigation. After final determinations were reached, the processors challenged Commerce's initiation for lack of standing. The CIT rejected this challenge, finding that it would be unreasonable to require that Commerce terminate the investigation based on a flaw with standing at the time of the filing of the petition, because Commerce "is authorized to commence an antidumping duty investigation *sua sponte* whenever it determines that an investigation is warranted based upon available information." *Id.* Had Commerce determined to self-initiate, it would have possessed the

authority to continue the investigation on the same timetable that it originally followed. Thus, Commerce was not required to start a new investigation based on any flaw with standing at the time of initiation.

In *Suramerica de Aleaciones Laminadas, C.A. v. United States*, the CIT found that a petition was not filed on behalf of the domestic industry, and the "ensuing investigation was therefore declared a nullity." 44 F.3d 978 (Fed. Cir. 1994). The Federal Circuit reversed the CIT. In so doing, it explained:

> Commerce can initiate a countervailing or antidumping duty investigation completely on its own, without any petition having been filed by an "interested party." 19 U.S.C. § 1671a(a), 1673a(a). Commerce need only determine, from information available to it, "that a formal investigation is warranted." 19 U.S.C. § 1671a(a); 1673a(a). … There is no indication whatever that the phrase "from information available to it" is to be given a narrower meaning than the plain meaning of the words — Commerce could use information made "available to it" by a petition filed by one who is not "an interested party," or by a petition filed by "an interested party" but not "on behalf of an industry." There is no requirement that Commerce had to acquire on its own the information leading to a self-started investigation, or that Commerce must ignore or cannot rely on information made available by a petition which may for some reason fall short of the statutory requirements for a petition-induced investigation.

*Id.* Based on this reasoning, the Federal Circuit ultimately found that "Commerce has broad discretion in deciding when to pursue an

investigation, and when to terminate one," and reversed the CIT for finding fault with Commerce's initiation. *Id.*

Here, even if there was any defect in standing at the time Cambria filed the petitions, that does not mean that Commerce's initiation of the investigation should be nullified. If there is a defect in standing, that only means that Commerce is not compelled under the statute to initiate an investigation. However, Commerce has the authority to self-initiate investigations whenever it determines that the information available to it warrants a formal investigation, and it could have done so in the underlying proceeding based on the information that was before it.

## V. Conclusion

For the foregoing reasons, Cambria respectfully requests that the Court uphold Commerce's initiation of the underlying investigation as supported by substantial evidence and in accordance with law.

* * *

Respectfully submitted,

/s/ Luke A. Meisner
Luke A. Meisner
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

Date: April 6, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1077

**Short Case Caption:** Pokarna Engineered Stone Limited v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 11,791 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 04/6/2022

Signature: /s/ Luke A. Meisner

Name: Luke A. Meisner

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2022-1077

**Short Case Caption:** Pokarna Engineered Stone Limited v. US

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 42 number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 04/06/2022 Signature: /s/ Luke A. Meisner

Name: Luke A. Meisner

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2022-1077

**Short Case Caption** Pokarna Engineered Stone Limited vs. US

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 04/06/2022

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☑ Other: Secure File Transfer Protocol

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Jonathan Thomas Stoel | Hogan Lovells US LLP, 555 Thirteenth Street NW, Washington, DC 20004, jonathan.stoel@hoganlovells.com |
| Joshua E. Kurland | DOJ, Commercial Litigation Branch, Civil Division, PO Box 480, Ben Franklin Station, Washington, DC 20044, Joshua.E.Kurland@usdoj.gov |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 04/06/2022

Signature: /s/ Luke A. Meisner

Name: Luke A. Meisner