No. 22-1077

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

POKARNA ENGINEERED STONE LIMITED,

Plaintiff,

M S INTERNATIONAL, INC.,

Plaintiff-Appellant,

v.

UNITED STATES, CAMBRIA COMPANY LLC,

Defendants-Appellees

Appeal from the United States Court of International Trade
Case No. 1:20-cv-00127, Senior Judge Leo M. Gordon

# NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLEE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

JOSHUA E. KURLAND
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.E.Kurland@usdoj.gov

*Attorneys for Defendant-Appellee United States*

OF COUNSEL:
VANIA WANG
Attorney
Department of Commerce
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

April 6, 2022

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES........1

STATEMENT OF THE CASE........1

STATEMENT OF FACTS........1

I. Legal Framework........1

II. Administrative Proceedings........6

A. Industry Support Dispute........6

B. Commerce's Determination........7

III. Trial Court Proceedings........10

SUMMARY OF THE ARGUMENT........12

ARGUMENT........14

I. Standard Of Review........14

II. Commerce's Industry Support Determination Was Lawful........16

A. The Statute Is Silent Regarding Who Constitutes A "Producer" For Industry Support Purposes........16

B. Commerce's Statutory Interpretation Is Reasonable........26

III. Commerce's Determination That Fabricators Are Not "Producers" For Industry Support Purposes Is Supported By Substantial Evidence........32

A. Commerce Reasonably Considered The Record Evidence........33

B. MSI's Substantial Evidence Arguments Lack Merit........38

C. The Fact That The ITC Reached A Different Conclusion For Its Own Purposes Does Not Undermine Commerce's Determination........42

IV. Commerce Did Not Abuse Its Discretion By Declining To Extend The Deadline For Determining Industry Support ........................................47

CONCLUSION ........................................................................................48

## CONFIDENTIAL MATERIAL DESIGNATION

The material designated as confidential using brackets on pages 40-41 of this brief entails information about company operations that the appellant designated as confidential in the underlying administrative proceeding and that was released by the Department of Commerce under an administrative protective order (APO). The APO provides that the information cannot be shared with any party not approved under the APO. Because the information is proprietary information of another person, pursuant to regulation, no further public summary is provided in the public version of this response brief beyond the general descriptor required by the Court's rules. *See* 19 C.F.R. § 351.304(c)(1) ("A submitter should not create a public summary of business proprietary information of another person.").

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Algoma Steel Corp., Ltd. v. United States*,
688 F. Supp. 639 (Ct. Int'l Trade 1988), *aff'd*, 865 F.2d 240 (Fed. Cir. 1989)...44

*Asociacion Colombiana de Exportadores de Flores v. United States*,
693 F. Supp. 1165 (Ct. Int'l Trade 1988)............................................................42

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)..........................................................................15

*Baoding Yude Chem. Indus. v. United States*,
170 F. Supp. 2d 1335 (Ct. Int'l Trade 2001)........................................................17

*Bell Supply v. United States*,
888 F.3d 1222 (Fed. Cir. 2018)..........................................................................32

*Brother Indus. (USA), Inc. v. United States*,
801 F. Supp. 751 (Ct. Int'l Trade 1992)........................................................ 16, 19

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ....................................................................................*passim*

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007)................................................................... 14, 34

*Conn. Steel Corp. v. United States*,
462 F. Supp. 2d 1322 (Ct. Int'l Trade 2006)........................................................17

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ..........................................................................................14

*Consol. Fibers, Inc., v. United States*,
574 F. Supp. 2d 1371 (Ct. Int'l Trade 2008)........................................................44

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ..........................................................................................14

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*,
357 F.3d 1294 (Fed. Cir. 2004) .......................................................................45

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) .......................................................................34

*Duferco Steel, Inc. v. United States*,
296 F.3d 1087 (Fed. Cir. 2002) .........................................................................2

*Elkem Metals Co. v. United States*,
468 F.3d 795 (Fed. Cir. 2006) .................................................................. 25, 26

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) .......................................................................45

*Eurodif S.A. v. United States*,
411 F.3d 1355 (Fed. Cir. 2005) ................................................................*passim*

*Floral Trade Council v. United States*,
41 F. Supp. 2d 319 (Ct. Int'l Trade 1999) .......................................................26

*Gov't of Argentina v. United States*,
542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ....................................................34

*HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*,
361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) ....................................................17

*Haggar Apparel Co. v. United States*,
222 F.3d 1337 (Fed. Cir. 2000) .......................................................................18

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ....................................................34

*Hosiden Corp. v. Advanced Display Mfrs. Of America*,
85 F.3d 1561 (Fed. Cir. 1996) .................................................................. 42, 44

*Jacobi Carbons AB v. United States*,
422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ....................................................38

*Mitsubishi Elec. Corp. v. United States*,
898 F.2d 1577 (Fed. Cir. 1990) .......... 42, 43, 44

*Nabisco, Inc. v. United States*,
599 F.2d 415 (Ct. Cl. 1979) .......... 17

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 15

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
284 F.3d 1261 (Fed. Cir. 2002) .......... 31

*Pokarna Engineered Stone Limited v. United States*,
547 F. Supp. 3d 1300 (Ct. Int'l Trade 2021) .......... 1, 19

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) .......... 29

*Ragsdale v. Wolverine World Wide, Inc.*,
535 U.S. 81 (2002) .......... 25

*Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*,
268 F.3d 1376 (Fed. Cir. 2001) .......... 14

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004) .......... 15

*Torrington Co. v. United States*,
68 F.3d 1347 (Fed. Cir. 1995) .......... 4, 14

*U.S. Steel Group v. United States*,
998 F. Supp. 1151 (Ct. Int'l Trade 1998) .......... 26

*Union Steel v. United States*,
713 F.3d 1101 (Fed. Cir. 2013) .......... *passim*

*United States v. Eurodif*,
555 U.S. 305 (2009) .......... 14, 15

*USEC Inc. v. United States*,
259 F. Supp. 2d 1310 (Ct. Int'l Trade 2003) .......... *passim*

*USEC Inc. v. United States*,
281 F. Supp. 2d 1334 (Ct. Int'l Trade 2003), *aff'd in relevant part and rev'd on other grounds,* 411 F.3d 1355 (Fed. Cir. 2005) .......... *passim*

*Uttam Galva Steels Ltd. v. United States*,
997 F.3d 1192 (Fed. Cir. 2021) .......... 2

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 45

**Statutes**

19 U.S.C. § 1516a .......... 14, 39

19 U.S.C. § 1673 .......... 2, 3

19 U.S.C. § 1673a .......... *passim*

19 U.S.C. § 1673b .......... 44

19 U.S.C. § 1677 .......... 1

19 U.S.C. § 1677(4) .......... 3

19 U.S.C. § 1677(9) .......... 3, 4, 19

19 U.S.C. § 1677(34) .......... 2

28 U.S.C. § 2639(a) .......... 14

**Administrative Determinations**

*Calcium Hypochlorite from the People's Republic of China*,
79 Fed. Reg. 2,410 (Dep't of Commerce Jan. 14, 2014) .......... 30

*Certain Quartz Surface Products From India and the Republic of Turkey*,
84 Fed. Reg. 25,529 (Dep't of Commerce June 3, 2019) .......... 7, 43

*Certain Quartz Surface Products From India and Turkey,*
85 Fed. Reg. 37,422 (Dep't of Commerce June 22, 2020) ................................1, 9

*Chlorinated Isocyanurates from the People's Republic of China*,
78 Fed. Reg. 59,001 (Dep't of Commerce Sept. 25, 2013)..................... 31, 35, 43

*Chlorinated Isocyanurates from China and Japan*,
Inv. Nos. 701-TA-501 and 731-TA-1226, USITC Pub. 4431 (Nov. 2013).........43

*Chlorinated Isocyanurates from China and Japan*,
Inv. Nos. 701-TA-501 and 731-TA-1226, USITC Pub. 4494 (Nov. 2014).........43

*Multilayered Wood Flooring from China*,
Inv. Nos. 701-TA-476 and 731-TA-1179, USITC Pub. 4278 (Nov. 2011).........35

*Quartz Surface Products from China*,
Inv. Nos. 701-TA-606 and 731-TA-1416, USITC Pub. 4794 (June 2018) .. 37, 46

*Raw Flexible Magnets from China and Taiwan*,
Inv. Nos. 701-TA-452 and 731-TA-1129-30, USITC Pub. 4300 (Aug. 2008) ...35

**Legislative History**

S. Rep. No. 249, 96th Cong., 1st Sess., (1979), *reprinted in*
1979 U.S.C.C.A.N. 381 ......................................................................... *passim*

Statement of Administrative Action accompanying Uruguay Round Agmts. Act,
H.R. Doc. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ........ 27, 45, 47

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that he is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. Counsel is aware that *M S International, Inc. v. United States*, No. 20-00137 (Ct. Int'l Trade), *M S International, Inc. v. United States*, No. 20-00138 (Ct. Int'l Trade), *M S International, Inc. v. United States*, No. 20-00139 (Ct. Int'l Trade), and portions of *M S International, Inc. v. United States*, No. 19-00140 (Ct. Int'l Trade) and *M S International, Inc. v. United States*, No. 19-00141 (Ct. Int'l Trade) may be affected by the Court's decision in this appeal (other portions of the latter two cases are currently before the Court in Fed. Cir. Nos. 2021-1679 and -1680).

## STATEMENT OF THE ISSUES

1. Whether the Department of Commerce's interpretation of the term "producer" for industry support purposes under 19 U.S.C. §§ 1673a and 1677 lawfully allows Commerce to evaluate the sufficiency of a fabricator's production-related activities.

2. Whether Commerce's determination that quartz surface product fabricators do not perform sufficient production-related activities to be considered "producers" for industry support purposes is supported by substantial evidence.

## STATEMENT OF THE CASE

This appeal concerns the less-than-fair-value investigation of certain quartz surface products (QSPs) from India. *See Certain Quartz Surface Products From India and Turkey,* 85 Fed. Reg. 37,422 (Dep't of Commerce June 22, 2020), and accompanying Issues and Decision Memorandum (IDM). M S International, Inc. (MSI), a QSP importer, appeals the final judgment in *Pokarna Engineered Stone Limited v. United States*, 547 F. Supp. 3d 1300 (Ct. Int'l Trade 2021), sustaining Commerce's industry support determination in its investigation.

## STATEMENT OF FACTS

### I. Legal Framework

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. Under that regime, dumping occurs when a foreign

firm sells a product in the United States at a price lower than the product's normal value. *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1194 (Fed. Cir. 2021) (citation omitted). By statute, Commerce must impose antidumping duties on imported goods that are being sold, or are likely to be sold, in the United States at "less than fair value" to the detriment of a United States domestic industry. 19 U.S.C. §§ 1673, 1677(34) (defining "Dumped; dumping"). Commerce determines a respondent's dumping margin by calculating the amount by which normal value exceeds the United States price (export price or constructed export price). *Id.*

Commerce typically initiates an antidumping duty investigation based on a petition filed by a domestic industry alleging that it is being injured by unfairly traded imports. *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002).[1] The petition must allege "the elements necessary for the imposition of the duty imposed by {19 U.S.C. § 1673}" and be "accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1673a(b)(1).

To initiate an antidumping duty investigation, Commerce must, within 20 days after the date on which a petition is filed and "after examining, on the basis of sources readily available to {Commerce}, the accuracy and adequacy of the

[1] Commerce may also self-initiate an investigation if it determines that doing so is warranted. *See* 19 U.S.C. § 1673a(a)(1).

evidence provided in the petition," "determine whether the petition alleges the elements necessary for the imposition of a duty under {19 U.S.C. § 1673} and contains information reasonably available to the petitioner supporting the allegations," as well as "determine if the petition has been filed by or on behalf of the industry." 19 U.S.C. § 1673a(c)(1)(A). The term "industry" for purposes of the antidumping statute means "the *producers*, as a whole, of a domestic like product, or those *producers* whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A) (emphasis added).

For the petition to be filed by or on behalf of the domestic industry, the statute requires: (1) the domestic producers or workers who support the petition to account for at least 25 percent of the total production of the domestic like product, and (2) the domestic producers or workers who support the petition to account for more than 50 percent of the production of the domestic like product produced by the portion of the industry expressing support for or opposition to the petition. 19 U.S.C. § 1673a(c)(4)(A). "Domestic producers or workers" for these purposes is defined as "interested parties who are eligible to file a petition under {19 U.S.C. § 1673a(b)(1)}." 19 U.S.C. § 1673a(c)(5). Section 1673a(b)(1), in turn, describes interested parties who are eligible to file a petition as those described in paragraphs (C), (D), (E), (F), and (G) of 19 U.S.C. § 1677(9). These interested parties include

"a manufacturer, producer, or wholesaler in the United States of a domestic like product . . . ." 19 U.S.C. § 1677(9)(C). The terms "manufacturer, producer, or wholesaler" are not defined by the statute.

Faced with statutory silence on the meaning of "producer"—and situations in which entities engaged in processing pre-existing merchandise may claim to be part of the domestic industry—Commerce has considered legislative history for guidance in evaluating petitions like the one in this case. The legislative history explains that Congress intended the statutory standing requirement "to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S. Rep. No. 249, 96th Cong., 1st Sess., at 47 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 433; *see also generally Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) ("The purpose underlying the antidumping laws is to prevent foreign manufacturers from injuring domestic industries by selling their products in the United States at less than 'fair value,' *i.e.*, at prices below the prices the foreign manufacturers charge for the same products in their home markets.").

Consequently, Commerce has determined for industry support purposes "that in order to be a producer, an entity must have a 'stake' in the domestic industry in question." *Eurodif S.A. v. United States*, 411 F.3d 1355, 1360 (Fed. Cir. 2005) (*Eurodif I*). This requires a company to "perform some important or

substantial manufacturing operation." *Id.* at 1361 (citation and quotation marks omitted). Therefore, Commerce evaluates whether an entity is a "producer" for industry support purposes, based on the overall nature of the entity's production-related activities in the United States, to determine whether the entity's production operations are sufficient for it to be considered part of the domestic industry. *See USEC Inc. v. United States*, 259 F. Supp. 2d 1310, 1327 (Ct. Int'l Trade 2003) (*USEC I*); *USEC Inc. v. United States*, 281 F. Supp. 2d 1334, 1345-46 (Ct. Int'l Trade 2003) (*USEC II*), *aff'd in relevant part, Eurodif I*, 411 F.3d at 1360-61 (sustaining Commerce's interpretation of producer).

To determine whether a company engages in sufficient production-related activities, Commerce considers six factors that the International Trade Commission (ITC) similarly, but separately, examines to evaluate whether an entity is part of a domestic industry for purposes of determining injury: (1) the source and extent of the entity's capital investment; (2) the technical expertise involved in its United States production activities; (3) the value added to the product in the United States; (4) employment levels; (5) the quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product. *See USEC I*, 259 F. Supp. 2d at 1327; Appx1026. MSI calls this the "sufficient production-related activities" test. *E.g.*, MSI Br. 3.

The Court of International Trade and this Court have previously sustained, as lawful, Commerce's interpretation of "producer" in the context of Commerce's industry support determination. *USEC II*, 281 F. Supp. 2d at 1345-46; *Eurodif I*, 411 F.3d at 1360-61, 1365-66 (affirming this aspect of *USEC II*). In particular, the courts have upheld Commerce's different interpretations of the term "producer" in different contexts as reasonable given the industry support provision's purpose. *Id.*

## II. <u>Administrative Proceedings</u>

### A. <u>Industry Support Dispute</u>

In May 2019, Cambria Company LLC (Cambria) filed a petition for imposition of antidumping duties on certain quartz surface products from India. Appx48-390.[2] MSI, a United States importer of quartz surface products, filed comments challenging Cambria's standing to file the petition, noting that Cambria bore the burden of establishing standing and alleging that Cambria failed to include quartz surface product fabricators as domestic industry "producers" in its industry support calculation. Appx391-396. MSI's submission included letters that MSI had obtained from various fabricators opposing Cambria's petition. Appx546-826. Cambria responded with comments supporting its standing to file the petition,

[2] Previously, Cambria had requested, and Commerce had initiated, a similar investigation concerning quartz surface products from China. Appx1026. In the China investigation, Commerce in initiating the proceeding and the ITC in its preliminary determination had both excluded quartz surface product fabricators in defining the domestic industry. Appx1028.

along with rebuttal information. Appx879-1001. Commerce discussed the parties' submissions in its determination to initiate an investigation. Appx1025-1029.

### B. Commerce's Determination

In accordance with the twenty-day statutory deadline, Commerce initiated an investigation on May 28, 2019. *Certain Quartz Surface Products From India and the Republic of Turkey*, 84 Fed. Reg. 25,529 (Dep't of Commerce June 3, 2019) (*Initiation*), and accompanying Initiation Checklist (May 28, 2019), Appx1002-1046. After reviewing the record evidence relating to fabricators, Commerce determined that fabricators did not perform sufficient production-related activities, and thus were not "producers" for purposes of determining industry support. Appx1017, Appx1025-1032 (relevant portions of Attachment II to Initiation Checklist, detailing Industry Support determination).

Commerce explained that the detailed information Cambria had submitted made it "clear that there are significant differences in the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment, between quartz surface product slab producers and fabricators." Appx1030 (citing Petitioner's Standing Comments at Appx882-896, Appx939-997); *see also* Appx1025-1029 (detailing both parties' arguments). For example, the evidence showed that "there are seven steps in the production of quartz surface products: (1) mixing raw materials, (2) combining, (3) dispensing

and molding, (4) pressing, (5) curing, (6) cooling, and (7) polishing." Appx1031 (citation omitted). Likewise, Cambria provided supporting documents indicating that quartz slab production involves highly complex and interconnected machinery and engineering processes that requires specialized equipment dedicated to QSP production. Appx1030, Appx1031 (citations omitted). Thus, Commerce found that the record evidence indicated that the production process for quartz slabs involves considerable capital investment, specialized knowledge and employees, and the use of specialized equipment, while also providing the bulk of the value of the fabricated product. Appx1030-1031.

By contrast, Commerce explained that the information MSI provided indicated that fabricators engage in a process through which they: "(1) consult with customers, (2) develop engineering diagrams, (3) perform intricate cutting, and (4) perform various edge and surface finishing operations." Appx1031 (citation omitted). Based on the record, Commerce found that fabricators have far lower capital investment, considerably less specialized knowledge and employees, and utilize broadly-available equipment compared to quartz slab production, such that "the manufacturing equipment and processes used by fabricators are significantly different from those used by the domestic producers of quartz surface products slabs." Appx1030-1031.

Overall, Commerce found that "the fabrication process does not change the fundamental physical characteristics imparted during the slab production process" because "fabricators simply convert an existing slab into a geometrical form for its end use or application," while also noting that "many fabricators rely on imported slabs to produce final fabricated products." Appx1030 (citations omitted). Thus, Commerce did not include fabricators as part of the industry support calculation. Appx1032. Commerce nonetheless observed that, even if it had included the fabricators' MSI had identified, it still would have found that Cambria's petition had the requisite level of industry support. *Id.* n.129.

Commerce, as required, notified the ITC of its decision to initiate an investigation. Appx1047. MSI subsequently submitted a case brief challenging Commerce's industry support determination. Appx1844-1849. In its final determination, Commerce explained that, by statute, it could not reconsider its industry support determination after initiation. Appx1896-1898. Commerce found dumping by the foreign respondents in the investigation. *Certain Quartz Surface Products From India and Turkey,* 85 Fed. Reg. at 37,423. The ITC, in its final determinations for the China and India investigations, ultimately included fabricators in the domestic industry for its separate injury analysis. MSI Br. 15-16.

## III. Trial Court Proceedings

MSI challenged Commerce's determination regarding fabricators, alleging that Commerce's use of the sufficient production-related activities test was unlawful and that its determination was not supported by substantial evidence. Appx22, Appx27-28. In October 2021, the trial court denied MSI's claims, holding that Commerce's interpretation of "producers" was lawful and that Commerce's finding that fabricators were not producers for industry support purposes was supported by substantial evidence. Appx26-27, Appx31.

The trial court first explained that the Court of International Trade and this Court had rejected previous challenges to Commerce's interpretation of "producer" for industry support purposes, holding, under *Chevron* step two, that "Commerce's interpretation of the word 'producer' was reasonable and, thus, in accordance with law." Appx24 (quoting *Eurodif I*, 411 F.3d at 1360). The trial court found MSI's efforts to distinguish this case from *USEC*/*Eurodif* unpersuasive because MSI was "unable to demonstrate why the Federal Circuit's legal analysis of Commerce's interpretation of the term 'producers' does not have equal application here." *Id.*

The trial court went on to hold that "{i}t is evident to the court that the term 'producers' is not defined in § 1673a(c)(4)" and that "{w}ithout a definition, there is no clear statutory answer as to whether 'producers' is broadly defined so as to include QSP fabricators for purposes of Commerce's industry support analysis."

Appx24-25. Thus, as the court explained, MSI's analysis that the statute limits the types of producers who may be excluded "misses a step" because it "applies to those parties considered 'producers' of the domestic like product and prescribes limited circumstances for exclusion of their opinions," but "does not address if or how Commerce should consider the opinions of parties that Commerce finds are not 'producers' of the relevant domestic like product." Appx25.

Turning to whether Commerce's interpretation of the term "producers" is based on a permissible construction, the trial court agreed that "Commerce may reasonably interpret 'producers' in the industry support provision to mean entities that have a 'stake' in the industry." Appx26-27. It thus sustained Commerce's reliance on the sufficient production-related activities test as a lawful interpretation of the term "producers" in 19 U.S.C. § 1673a(c)(4). Appx27.

Next, the trial court sustained Commerce's determination that QSP fabricators are not "producers" for industry support purposes as supported by substantial evidence. Appx27-31. The court highlighted Commerce's explanation of the significant differences in the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment used between QSP slab producers and fabricators. Appx28-29. The court found that Commerce considered MSI's comments and evidence, and that MSI's arguments emphasizing certain metrics "ignore Commerce's findings and

conclusions in the context of a comparison of fabricators to slab producers." Appx30. The trial court further explained that MSI's arguments "challenge the weight Commerce assigned" to certain evidence, and that the availability of "an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination." Appx31 (citations omitted). Thus, although finding the evidentiary issue to be a closer question than the legal one, the trial court sustained Commerce's determination.

Addressing MSI's additional arguments, the trial court found that Commerce's and the ITC's differing findings did not alter the reasonableness of Commerce's determination based on the record at initiation. Appx32-33. The court also determined that Commerce was reasonable not to extend the deadline to determine whether to initiate an investigation, when it determined that the evidence on industry support meets the threshold for petitioner standing. Appx34-35.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The trial court's judgment should be affirmed because Commerce's statutory interpretation is lawful and its determination that QSP fabricators are not producers for industry support purposes is supported by substantial evidence.

First, Commerce's interpretation of the statutory term "producers" for industry support purposes as requiring an entity to have a "stake" in the domestic

industry through some important or substantial manufacturing operation is reasonable. The statute does not define "producers," Commerce's interpretation flows from the statute's history, and Commerce's reliance on a sufficient production-related activities test to draw the line—which even MSI concedes must exist—between entities who produce and those who process the domestic like product is both reasonable and consistent with this Court's jurisprudence previously addressing this legal question.

Second, substantial evidence supports Commerce's determination that the QSP fabricators at issue in this case are not producers. Record evidence in the form of declaratory evidence, periodicals, photographs, and other materials submitted by the parties demonstrated significant differences in the level of complexity and capital investment, employment, training and technical expertise, processes, and type of equipment fabricators employ compared to QSP slab producers who produce the domestic like product.

Finally, that the ITC later reached a different determination for purposes of its separate injury analysis than that reached by Commerce for industry support purposes does not render Commerce's determination unreasonable or unsupported by substantial evidence. Commerce and the ITC make determinations for different purposes based on separate timelines and administrative records.

# ARGUMENT

## I. Standard Of Review

This Court upholds Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) (*Eurodif II*) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence."). The Court in doing so recognizes "Commerce's special expertise" as "master" of the antidumping laws. *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001); *Torrington*, 68 F.3d at 1351; *see also* 28 U.S.C. § 2639(a)(1) (Commerce determination "is presumed to be correct").

Substantial evidence connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The Court may not overturn a determination "simply because {it} would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291,

1296 (Fed. Cir. 2007) (citations omitted). Hence, a party disputing Commerce's determination as unsupported by substantial evidence "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains a determination if it is reasonable and supported by the record as a whole, including detracting evidence. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Court first determines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id.* at 842-43. If the statute does not answer the issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such circumstances, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif II*, 555 U.S. at 316 (citations omitted). Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.*

## II. Commerce's Industry Support Determination Was Lawful

Commerce's interpretation of the industry support portion of the statute is lawful and should be sustained under the second prong of *Chevron*. The statute does not define what entities constitute "producers" of the domestic like product. Accordingly, Commerce has looked to the legislative history and concluded that, to qualify as a "producer" for industry support purposes, an entity must have sufficient production-related activities. This Court has already recognized that Commerce's interpretation is reasonable.

### A. The Statute Is Silent Regarding Who Constitutes A "Producer" For Industry Support Purposes

The Court of International Trade and this Court have previously recognized that the statutory term "producer" is undefined and sustained Commerce's determination under the sufficient production-related activities test as reasonable and consistent with the statute's legislative history. *See USEC I*, 259 F. Supp. 2d at 1327-28 (discussing Commerce's application of sufficient production-related activities test and observing that "producer" is undefined); *USEC II*, 281 F. Supp. 2d at 1345-46 (sustaining determination); *Eurodif I*, 411 F.3d at 1360-61, 1365-66 (affirming this aspect of Commerce's determination as reasonable and lawful); *see also Brother Indus. (USA), Inc. v. United States*, 801 F. Supp. 751, 757 (Ct. Int'l Trade 1992) (recognizing "producer" as undefined statutory term), *cited in Eurodif I*, 411 F.3d at 1361.

Even MSI concedes that some forms of processing pre-existing merchandise are insufficient to qualify an entity as a producer and that the sufficient production-related activities test "may assist with that analysis." MSI Br. 25 n.2.[3] Yet, this type of line-drawing exercise "is precisely the type of discretion left within the agency's domain." *Baoding Yude Chem. Indus. v. United States*, 170 F. Supp. 2d 1335, 1343 (Ct. Int'l Trade 2001); *see also*, *e.g.*, *HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 361 F. Supp. 3d 1314, 1327 (Ct. Int'l Trade 2019) (same); *Conn. Steel Corp. v. United States*, 462 F. Supp. 2d 1322, 1331 (Ct. Int'l Trade 2006) (assessing data reliability "is a factual line-drawing exercise particularly well-suited for the expertise of an agency . . . rather than the courts.").

As this Court's predecessor elaborated, such line-drawing "is precisely the task for which administrative agencies, with their special expertise and experience, are peculiarly suited to perform effectively; and it is in deference to that experience and judgment that courts refuse to disturb such determinations except when they are shown to be arbitrary." *Nabisco, Inc. v. United States*, 599 F.2d 415, 422 (Ct. Cl. 1979); *see also id.* at 419 (explaining that "line-drawing" "falls within an agency's special expertise and discretion" in context of affirming exclusion of

[3] MSI relies on the trivial example of a company that merely performs a painting process on subject merchandise, but that should not mask MSI's key (and correct) concession that a line must be drawn to distinguish what processing is and is not sufficient to make an entity a producer for industry support purposes. *Id.*

cookies, crackers, and snacks from definition of "food products"); *Haggar Apparel Co. v. United States*, 222 F.3d 1337, 1341-42 (Fed. Cir. 2000) (sustaining agency line-drawing determination concerning kinds of operations that would be considered incidental to assembly process in foreign country).

Consequently, MSI's contentions that the question of whether to include fabricators is a *Chevron* step one issue, and that the statute prohibits Commerce from applying the sufficient production-related activities test to address it, lack merit. The courts previously have held that Commerce's reliance on the test is reasonable and lawful. *See USEC II*, 281 F. Supp. 2d at 1345-46 (sustaining Commerce's approach); *Eurodif I*, 411 F.3d at 1360-61, 1365-66 (same). This Court is bound to follow its prior holding, which, in any event, is correct.

Nonetheless, MSI portrays the matter as a *Chevron* step one issue. MSI argues that the statute defines the domestic industry to include all producers of the domestic like product, and emphasizes that both fabricated and unfabricated quartz surface products are covered by the scope and domestic like product definitions in Commerce's investigation. *See* MSI Br. 25-32. The fundamental flaw in MSI's reasoning is that it elides the question of whether entities that perform processing on a pre-existing product—such as the fabricators at issue in this case—have a sufficient stake in the domestic industry to be considered "producers" for industry support purposes. *See* S. Rep. 96-249, at 47; *Eurodif I*, 411 F.3d at 1361

(upholding Commerce's interpretation of "having a 'stake' as requiring that a company 'perform some important or substantial manufacturing operation'") (citation omitted).

Relying on dictionary definitions of the word "producer," MSI argues that fabricators are producers under the ordinary meaning of the term. *See* MSI Br. 30-32.[4] Both the statutory scheme and relevant case law contradict this argument. First, 19 U.S.C. § 1673a(c)(5) *does* define domestic producers for purposes of that subsection as those interested parties who are eligible to file a petition under 19 U.S.C. § 1673a(b)(1), but that provision merely cross-references 19 U.S.C. § 1677(9)(C), which in turn refers to "manufacturers, producers, and wholesalers." The Court of International Trade has consequently observed that the statute does not define the terms "manufacturers, producers, and wholesalers" for these purposes. *See USEC I*, 259 F. Supp. 2d at 1328 ("producer" is "a term that is not statutorily defined"); *Brother Indus.*, 801 F. Supp. at 757 ("To have standing to file a petition, a party must be a 'manufacturer, producer, or wholesaler.' . . . These terms are not defined in the statute."). This Court in *Eurodif I* likewise recognized the ambiguity by analyzing—and affirming—Commerce's approach as reasonable under *Chevron* step two. *See* 411 F.3d at 1359, 1360-61, 1365-66. Given this

[4] MSI previously raised this argument on reply before the trial court, but it did not alter the trial court's analysis. *See Pokarna Engineered Stone Limited v. United States*, Ct. Int'l Trade No. 20-00127, ECF No. 54 at 7-8.

scheme, as the trial court explained, "{w}ithout a definition, there is no clear statutory answer as to whether 'producers' is broadly defined so as to include QSP fabricators for purposes of Commerce's industry support analysis." Appx24-25.

Even if this Court could ignore *Eurodif I*, which it cannot, MSI's dictionary definitions do not resolve the issue of whether an entity's processing activities are sufficient for it to be considered a producer of the product at issue for industry support purposes. Commerce deals with a variety of products. Production of different merchandise can involve different activities and may not look the same. Neither the dictionary definitions nor the statute address how or where to draw the line regarding what activities are sufficient to constitute production to transform a processor into a "producer" for industry support purposes. MSI's dictionary argument is also at odds with the legislative history (discussed below) stating that Congress intended domestic producers for industry support purposes to be those with a sufficient "stake" in the investigation, long understood as requiring an entity "perform some important or substantial manufacturing operation" with respect to the product in question. S. Rep. No. 96-249, at 47; *Eurodif I*, 411 F.3d at 1361 (citation omitted).[5]

[5] MSI's dictionary definition argument further relies on the inaccurate claim that Commerce, allegedly, concedes that fabricators are producers of the domestic like product for industry support purposes. *See* MSI Br. 30. As we explain below, Commerce consistently has found fabricators *not* to be producers under the statute.

These flaws are evident in MSI's arguments. MSI asserts that the *Oxford English Dictionary* defines "to produce" as "to make or manufacture (a product or commodity) from components or raw materials." MSI Br. 31. QSP fabricators, however, take an *existing* product and convert it into a geometrical form for installation—they do not "make or manufacture" QSPs from components (and certainly not raw materials). *See* Appx1030. Likewise, MSI asserts that Merriam-Webster defines a "producer" as one who "manufactures crude materials into articles of use." MSI Br. 31. But this begs the question of whether fabricators use "crude materials" when they process finished QSP slabs that have already been altered from their natural state. *See* Appx1030 (explaining that "the fabrication process does not change the fundamental physical characteristics imparted during the slab production process"). Thus, dictionary definitions are not dispositive and may even create contradictions. For example, another definition contradicts MSI's arguments: the *Cambridge Dictionary* defines "produce" as "to make something or bring something into existence," whereas QSP fabricators take a product that slab producers have already brought into existence and process it to geometrical specifications. *See Produce, Cambridge Dictionary*, https://dictionary.cambridge.org (visited March 25, 2022).

Additionally, the statute does not use the term "fabricator." The dictionary definition therefore does not control whether Congress would have considered a

QSP fabricator to be a producer under the industry support provision. *See* MSI Br. 31-32. It would also be inappropriate for Commerce to use a dictionary definition of "fabricator," in place of the factual information on the record regarding the production-related activities performed by QSP fabricators, to determine whether QSP fabricators qualify as producers. There are different kinds of fabricators for different products, and fabricators may perform different roles for those products. Making a determination based on the general definition of fabricator is inapposite.

Nor does MSI's argument that both unfabricated and fabricated materials are included in the scope and the domestic like product of the investigation alter the analysis. *See, e.g.*, MSI Br. 26-27. Clearly, there are entities who perform processing or some form of further manufacturing on a product whose activities do not rise to the level of being a "producer" of the underlying product, even if the end-product is covered by the investigation (as MSI itself concedes). *See* MSI Br. 25 n.2. Given that the statute neither defines the term "producer," nor instructs Commerce on how to determine who qualifies, Commerce has permissibly filled the statutory gap by analyzing the extent of entities' production-related activities. The mere fact that fabricated products are included in the investigation does not resolve whether fabricators should be considered "producers" for industry support purposes. *See USEC II*, 281 F. Supp. 2d at 1346; *Eurodif I*, 411 F.3d at 1361 (sustaining Commerce's different interpretations of "producer" for determining

industry support and export price); *cf. Union Steel*, 713 F.3d at 1107-10 (sustaining different interpretations of statute concerning zeroing in different contexts).

Indeed, contrary to MSI's repeated emphasis that QSP products that undergo fabrication processes are covered in the scope and the domestic like product (*e.g.*, MSI Br. 16, 27), it is hardly uncommon for merchandise constituting a processed version of the underlying product to be included within the scope and a domestic like product of an investigation *without* transforming processors into members of the domestic industry. *See* Appx1032 (discussing examples). And as we discuss below, any fabricated product that fabricators make from a quartz slab previously produced in the United States would already be included in the domestic industry because it would have been produced by Cambria or another domestic QSP producer—including it a second time as a result of the fabrication process would amount to double-counting. Conversely, under MSI's interpretation, fabricators who are using imported QSPs from India and elsewhere and then processing ("fabricating") them to customer specifications would be considered domestic industry "producers," even though they are actually relying on imported products that Commerce has found to be dumped as their primary input.

Further, contrary to MSI's repeated claim, Commerce has not conceded that fabricators are producers of domestic like product for industry support purposes. *See, e.g.*, MSI Br. 9-10, 25 n.2, 27, 28, 38. This claim results from MSI conflating

the questions of what qualifies as domestic like product for purposes of calculating a dumping margin and which entities are considered a "producer" for purposes of determining industry support.[6] Commerce analyzed whether fabricators' activities were sufficient to consider them domestic producers and concluded, based on its examination of the record, that "fabricators do not perform sufficient production-related activities to be included in the domestic industry for industry support purposes." Appx1030; *see* Appx1032 (containing similar language).

MSI relatedly criticizes Commerce's word choice for using the term "processing" to describe the fabricators' activities in its determination in this case, compared to "production" terminology Commerce used in previous proceedings concerning QSPs from China. *See* MSI Br. 27-28. Each proceeding stands on its own, however, and Commerce's passing use of terminology in another proceeding is not a basis to overturn its determination here. Moreover, Commerce's statutory interpretation has not changed, and there is nothing improper about Commerce finding more apt language to describe activities that it has consistently determined do not rise to the level of turning fabricators of finished quartz surface products into QSP "producers" for industry support purposes. Appx1030-1032.

---

[6] An instance in which our trial court brief referred to fabricators' less complex "production process" hardly constitutes the admission MSI makes it out to be. *See* MSI Br. 9-10.

MSI additionally argues that the maxim of *expressio unius est exclusio alterius* precludes Commerce's use of the sufficient production-related activities test because the statute identifies only two specific kinds of "producers" who may be excluded for industry support purposes. *See* MSI Br. 32-38. Again, this skips over the key question of whether fabricators should be considered "producers" in the first place (while also relying on MSI's inaccurate claim that Commerce concedes that they are producers). The provision that MSI cites in support of its *expressio unius* argument, 19 U.S.C. § 1673a(c)(4)(B), does not address this key question because it only applies to companies that are otherwise domestic producers. Hence, notwithstanding this provision, the courts have treated the interpretation of "producer" as a matter of reasonableness under *Chevron* step two. *See USEC II*, 281 F. Supp. 2d at 1345-46; *Eurodif I*, 411 F.3d at 1360-61. The trial court correctly identified this flaw in rejecting MSI's argument. *See* Appx25.

Moreover, to the extent that MSI argues that section 1673a(c)(4)(B) implicitly means that Congress intended for Commerce to interpret "producer" in the context of industry support differently, the "Supreme Court has observed . . . that '{b}ecause of the deference given to agencies on matters about which the statutes they administer are silent, . . . *expressio unius* ought to have somewhat reduced force in this context.'" *Elkem Metals Co. v. United States*, 468 F.3d 795, 801 (Fed. Cir. 2006) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S.

81, 102 (2002) (O'Connor, J., dissenting)). In *Elkem*, this Court declined to use the *expressio unius* maxim to interpret the antidumping statute's constructed value provisions to impose an implied restriction upon Commerce. *See id.* Instead, the Court found that it was appropriate to read the statute literally when the statute imposed a restriction on a term but otherwise left the term undefined. *See id.*; *cf. U.S. Steel Group v. United States*, 998 F. Supp. 1151, 1157-59 (Ct. Int'l Trade 1998) (discussing problematic issues surrounding use of *expressio unius est exclusion alterius* to discern Congress's intent under *Chevron* step one).

In short, because the statute is silent regarding the meaning of "producer" and Congress has not directly spoken to the precise issue, this issue is not resolved at *Chevron* step one. Given that MSI does not attempt to justify its position under *Chevron* step two, the Court should deny MSI's legal argument on that basis.

**B. Commerce's Statutory Interpretation Is Reasonable**

Under *Chevron* step two, the Court must sustain Commerce's interpretation so long as it is reasonable. *See, e.g., Union Steel*, 713 F.3d at 1107; *Floral Trade Council v. United States*, 41 F. Supp. 2d 319, 323 (Ct. Int'l Trade 1999) ("Because Congress intended to delegate policymaking to Commerce, the Court must defer to Commerce's reasonable interpretation.") (citation omitted). Commerce's interpretation here is reasonable because it effectuates Congress' intent that only

entities that have a sufficient stake in the investigation be considered for purposes of the industry support requirement.

Congress intended that the standing requirement "provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S. Rep. No. 96-249, at 47; *see also* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, at 811 (1994) (SAA), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (explaining that, despite changes to standing requirement, "{t}he definition of domestic industry in Article 4 is virtually identical to that in the 1979 Code and current U.S. law."). In other words, Congress intended the requirement to ensure that petitions are filed by adversely affected domestic industries with an appropriate stake in the result of the investigation.

Commerce's approach comports with this intent. Commerce interprets a "producer" having a "stake" in the domestic industry as requiring an entity to "perform some important or substantial manufacturing operation" with respect to the product in question. *Eurodif I*, 411 F.3d at 1361 (citation omitted); *see* Appx1030 (discussing need for "sufficient production-related activities to be included in the domestic industry"). To make that determination, Commerce

analyzes the six factors identified by the sufficient production-related activities test. *See* Appx1026; *USEC I*, 259 F. Supp. 2d at 1327.

Both the Court of International Trade and this Court have already sustained Commerce's interpretation and approach as reasonable. *See USEC II*, 281 F. Supp. 2d at 1345-46, *aff'd in relevant part and rev'd on other grounds*, *Eurodif I*, 411 F.3d at 1360-61, 1365-66. The *USEC* and *Eurodif* litigation involved Commerce's antidumping and countervailing duty investigations of low enriched uranium from France, Germany, the Netherlands, and the United Kingdom. Commerce, in those investigations, determined that utility companies were not domestic industry "producers" for industry support purposes by analyzing the six factors that the ITC had articulated for examining whether a company may be considered a "member of the domestic industry" (*i.e.*, the sufficient production-related activities test). *See USEC I*, 259 F. Supp. 2d at 1327. The *USEC*/*Eurodif* plaintiffs, like MSI, challenged the lawfulness of Commerce's industry support determination, citing a now-defunct tolling regulation that suggested a different interpretation of "producer." *See id.* at 1327-28; *USEC II*, 281 F. Supp. 2d at 1334.

On remand in *USEC*/*Eurodif*, Commerce explained that its determination was rooted in the statute's legislative history and its corresponding interpretation of "producer" as requiring an entity to have a "stake" in the industry through some important or substantial manufacturing operation. *Eurodif I*, 411 F.3d at 1360-61.

The Court of International Trade and this Court both held that Commerce's focus on the sufficiency of an entity's production related activities was a reasonable interpretation of "producer" and thus lawful. *See USEC II*, 281 F. Supp. 2d at 1334; *Eurodif I*, 411 F.3d at 1360-61, 1365-66. Hence, the legal principles articulated in *Eurodif* apply equally in this case.

MSI attempts to distinguish *Eurodif* on its facts by arguing that *Eurodif*'s outcome is consistent with the ordinary meaning of producer and that it dealt with the issue of whether utilities could be producers even though they did not engage in production. MSI Br. 39-43. However, this Court in *Eurodif* specifically affirmed Commerce's statutory interpretation of "producer" for industry support purposes, relying on the sufficient production-related activities test—the same test Commerce applied here. *See Eurodif I*, 411 F.3d at 1360-61, 1365-66; *USEC I*, 259 F. Supp. 2d at 1327; *see also* Appx1030. MSI skips to the evidence and result of Commerce's analysis in *Eurodif*, rather than acknowledging that Commerce's method of analyzing the evidence based upon its statutory interpretation is the same in both cases. *See* MSI Br. 40-41; *see also PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (discussing Commerce's tremendous discretion in selecting methodologies to implement trade statute).

Moreover, as MSI briefly acknowledges (*see* MSI Br. 41), the utility companies in *Eurodif* claimed to be covered by the industry support provision

*precisely* because Commerce's regulations at the time defined them as "producers" of the merchandise for other purposes—a claim aligned with MSI's position. *See Eurodif I*, 411 F.3d at 1360; *USEC I*, 259 F. Supp. 2d at 1318, 1323 (discussing Commerce's now-defunct "tolling" regulation). The *Eurodif* appellants also argued, similar to MSI's claims that Commerce recognizes fabricators as QSP producers, that Commerce had made previous determinations that "control of the aspects of manufacture" (as the utilities did in that case) was sufficient to qualify an entity as a "producer." *Eurodif I*, 411 F.3d at 1360. Consequently, the trial court in this case correctly held that "MSI's efforts to distinguish this action from *Eurodif* are misplaced. It is unable to demonstrate why the Federal Circuit's legal analysis of Commerce's interpretation of the term 'producers' does not have equal application here." Appx24.

Further, Commerce's determination in this case is consistent with its practice following the uranium investigations. In subsequent proceedings, when warranted, Commerce has continued to evaluate the sufficiency of entities' production-related activities when identifying domestic producers for industry support purposes. *See, e.g.*, *Calcium Hypochlorite from the People's Republic of China*, 79 Fed. Reg. 2,410 (Dep't of Commerce Jan. 14, 2014), at Initiation Checklist Att. II, Appx1903 -1910 (Calcium Hypochlorite Initiation) (finding, after evaluating sufficiency of production-related activities, that repackers/private label marketers were not

producers and not part of domestic industry); *Chlorinated Isocyanurates from the People's Republic of China*, 78 Fed. Reg. 59,001 (Dep't of Commerce Sept. 25, 2013), at Initiation Checklist Att. II, Appx1911-1919 (Chlorinated Isocyanurates Initiation) (finding tableters not producers for industry support because "tableting does not require significant capital investment, technical production expertise, or employment levels when compared to the capital investment, technical expertise, and employment levels required to establish an integrated chlorinated isos operation"); *see also* Appx1028 n.95, Appx1032 n.128.

Given that MSI solely contends that Commerce's interpretation is impermissible because the statute speaks directly to the definition of "producer," its opening brief does not address the reasonableness of Commerce's interpretation. Thus, MSI provides no basis for this Court to depart from the prior rulings sustaining Commerce's approach as reasonable. *See Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) (plaintiff waives arguments not raised in opening brief).

Extending its *expressio unius* argument, MSI asserts that Commerce's exclusion of fabricators does not meet the criteria of 19 U.S.C. § 1673a(c)(4)(B), which provides specific instances in which Commerce may disregard the positions of domestic producers if they are related to foreign producers or are themselves importers of subject merchandise. *See* MSI Br. 32-33. As we explained above,

however, this provision would only apply to entities that are otherwise domestic producers. Here, Commerce found that fabricators are not domestic producers. *See* Appx1025-1032; *see also* Appx25 (addressing and rejecting MSI's argument). Hence, the section 1673a(c)(4)(B) criteria for disregarding the opposing positions of domestic producers do not apply. Commerce lawfully did not invoke section 1673a(c)(4)(B) because there were no *bona fide* domestic producers opposing Cambria's petition. *Cf. Bell Supply v. United States*, 888 F.3d 1222, 1229 (Fed. Cir. 2018) (holding that it was permissible for Commerce to apply substantial transformation analysis *without* resorting to anticircumvention analysis that would only apply if merchandise was otherwise outside scope of order).

## III. Commerce's Determination That Fabricators Are Not "Producers" For Industry Support Purposes Is Supported By Substantial Evidence

Commerce's determination that fabricators are not producers for industry support purposes is also well-grounded in the record evidence. Commerce reviewed this evidence for the sufficiency of the fabricators' domestic production-related activities using the following six factors: (1) the source and extent of the firm's capital investment; (2) the technical expertise involved in the United States production activities; (3) the value added to the product in the United States; (4) employment levels; (5) the quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product. *See* Appx1026, Appx1030-1032. The record

evidence demonstrates that significant differences exist between the level of complexity, investment, training and expertise, number of employees, and type of equipment required for the fabrication process compared to quartz slab production. *See* Appx1030; *see also* Appx1025-1029 (detailing parties' arguments on issue). Thus, substantial evidence supports Commerce's conclusion not to treat fabricators as producers for industry support purposes.

### A. Commerce Reasonably Considered The Record Evidence

MSI criticizes Commerce's determination, but its arguments boil down to disagreement with Commerce's weighing of evidence, which is not a basis for reversal. MSI Br. 43-47. For example, MSI criticizes multiple exhibits that Cambria submitted to illustrate differences it identified between quartz slab production and fabrication, asserting that each is an example of only one slab producer's or fabricator's experience. MSI Br. 45-47. However, Cambria's exhibits encompass the experiences of multiple different companies, and as a result, constitute multiple illustrative examples of differences between producers and fabricators. Among other things, they substantiate Cambria's assertion of a significant difference in the capital investment required for quartz slab production versus fabrication operations. *See* Appx1027 & n.84-85, (discussing Appx885-887, Appx939-968 (Cambria Standing Comments at 7-9, Exs. 2-5)). Yet, by way of further example, MSI disagrees with the exhibits illustrating this difference in

capital investment by incongruously comparing the size of individual slab producer investments to the collective size of investment by fabricators, in effect comparing apples and oranges. *See* MSI Br. 45-46. MSI repeatedly emphasizes the potential number of fabricators,[7] but pursuant to Commerce's well-established methodology to test whether an entity is a producer it is the *production-related activities* of the fabricators that are at issue, not necessarily the number of fabricators.

In short, just because Commerce evaluated and weighed the evidence differently than MSI does not mean Commerce's determination is unsupported by substantial evidence. *See*, *e.g.*, *Cleo*, 501 F.3d at 1296; *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015); *see also Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement" with Commerce's weighing of evidence insufficient basis for challenge); *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (same). Moreover, contrary to MSI's claims, Commerce reviewed and compared the evidence regarding the processes employed by QSP producers and fabricators. *See* Appx1025-1029, Appx1030-1031.

In previous cases, both Commerce and the ITC have considered entities that engage in processing such as finishing, cutting, and slitting not to be part of the

[7] This number was taken from a claim made to the ITC by "a small, independent fabricator" but has not otherwise been confirmed. Appx168.

domestic industry. *See* Appx1031 (citing *Multilayered Wood Flooring from China*, Inv. Nos. 701-TA-476 and 731-TA-1179 (Final), USITC Pub. 4278, at 8 (Nov. 2011); *Raw Flexible Magnets from China and Taiwan*, Inv. Nos. 701-TA-452 and 731-TA-1129-1130 (Final), USITC Pub. 4300, at 7-9 (Aug. 2008)); *see also* Appx1028 n.95, Appx1032 (noting previous Commerce determinations in *Chlorinated Isocyanurates* and *Calcium Hypochlorite*).

Here, consistent with these cases, and after reviewing the record, Commerce determined that QSP fabricators process subject merchandise and fall within this processing category. *See* Appx1031-1032. Specifically, Commerce found that "the fabrication process does not change the fundamental physical characteristics imparted during the slab production process, as fabricators simply convert an existing slab into a geometrical form for its end use or application." Appx1030 (citing Appx884, Appx939-943). Indeed, as Commerce noted, any domestically-produced slab that fabricators further processed is *already* accounted for in Cambria's industry support reporting. *See* Appx1032.

Substantial evidence supports this finding. Based on information in the petition, Commerce observed that QSP slab production involves seven steps: "(1) mixing raw materials, (2) combining, (3) dispensing and molding, (4) pressing, (5) curing, (6) cooling, and (7) polishing." Appx1031 (citing Appx65). By contrast, MSI's submission regarding the fabricators' process identified four steps: "(1)

consult with customers, (2) develop engineering diagrams, (3) perform intricate cutting, and (4) perform various edge and surface finishing operations." *Id.* (citing Appx395). Commerce likewise considered the detailed evidence—which includes declaratory evidence, periodicals, photographs, and other materials—showing that "quartz slab production involves highly complex and interconnected machinery and engineering processes," and consequently "requires specialized equipment dedicated to quartz surface products production and a significantly greater amount of capital investment, training and technical expertise, and number of employees than the fabrication process" (not to mention adding most of the product's value). Appx1030 (citing Appx884-890, Appx939-997).

Again, by contrast, the record shows that fabricators use different, more broadly available equipment than is required to produce quartz surface product slabs, and that equipment is not dedicated solely to QSPs. *See* Appx1031 (also noting that "fabricators do not use the same specialized equipment and machinery" as slab producers) (citing Appx886-887, Appx889-890, Appx939-943, Appx953-968, Appx969-970, Appx971-976). Based on the record, Commerce observed that the fabrication process not only "requires limited equipment that is not dedicated solely to quartz surface products," but also involves "fewer employees, much less technical expertise, and significantly less capital investment." Appx1030 (citing Appx884-889, Appx939-997). Thus, Commerce found that the "information on

the record supports the conclusion that the manufacturing equipment and processes used by fabricators are significantly different from those used by the domestic producers of quartz surface products slabs." Appx1031.

Overall, this evidence made it "clear that there are significant differences in the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment, between quartz surface product slab producers and fabricators." Appx1030 (citing, *inter alia*, Appx882-896). Commerce additionally concluded that many fabricators rely on imported quartz slabs to produce final fabricated products. *Id.*; *see also* Appx891, Appx898, Appx971-976, Appx998-1001.[8] Importantly, Commerce observed that because "the petitioner's industry support calculation properly accounts for all production of the domestic like product in the United States," it necessarily accounts for all QSPs produced in the United States that were further processed by fabricators.

[8] MSI criticizes the evidence supporting this finding as amounting to the profile of a single fabricator. *See* MSI Br. 34 n.7, 47. But, in reality—aside from the fact that the article *does* indicate that the fabricator uses imported slabs—the evidence was more extensive. *See* Appx974 ("We also buy a lot from MSI."). In addition to Cambria's representations, which themselves are probative record evidence, and the corresponding ITC preliminary finding, Cambria cited information circulated among parties opposing the petition, as well as information MSI itself had submitted evidencing how fabricators described themselves, further indicating that fabricators rely on imported quartz slabs to produce fabricated products. *See* Appx891, Appx1001, Appx898 (discussing Appx546-826); *see also* Appx1030 n.116 (citing *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416, USITC Pub. 4794, at 15 (June 2018) (prelim.)).

Appx1032. Including any domestically-produced slab that was then further processed by fabricators would only serve to double-count that merchandise.

### B. MSI's Substantial Evidence Arguments Lack Merit

The foregoing demonstrates that Commerce's determination is supported by substantial evidence. MSI nonetheless faults Commerce for citing record evidence to support its analysis without explicitly analyzing each fact, while also claiming (inaccurately) that Commerce did not consider evidence MSI submitted. *See* MSI Br. 12-13, 47-48; *but see* Appx30 (trial court disagreeing with MSI's contentions). Commerce, of course, is not required to detail each piece of evidence: "{A}bsent a showing to the contrary, the court presumes that Commerce has considered all of the record evidence." *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1325 n.10 (Ct. Int'l Trade 2019) (citation and bracketing omitted). Commerce documented its consideration of the parties' arguments and evidence, explained the conclusions it drew from the record, and cited evidence supporting its findings. Appx1025-1032. As the trial court observed, MSI "is unable to point to anything other than Commerce's adverse finding that fabricators are not 'producers' as evidence of Commerce's alleged failure to consider the evidence." Appx30.

MSI likewise contends that Commerce failed to consider detracting evidence (namely, MSI's claims about the complexity of the activities fabricators perform). *See* MSI Br. 18, 49-50. To the contrary, Commerce considered both MSI's and

Cambria's submissions, and ultimately disagreed with MSI's claims. *See* Appx1025-1029; Appx1031 (documenting consideration of MSI's comments). MSI's argument on this issue also focuses narrowly on fabricators, and as the trial court stated, "ignore{s} Commerce's findings and conclusions in the context of a *comparison* of fabricators to slab producers." Appx30.

In any event, none of the exhibits MSI proffered compel Commerce to find that fabricators perform sufficient production-related activities to be considered producers. Indeed, MSI's submission did not analyze the issue in terms of the six-factor production-related activities test. *See* MSI Standing Comments, Appx391-396. The exhibits, which we address below, do not render Commerce's conclusion based on the entirety of the record "unsupported by substantial evidence." 19 U.S.C. § 1516a(b)(1)(B)(i).

MSI's Exhibit 1 consists of screen shots from Cambria's website, showing that Cambria has experience dealing with fabricators and a fabricator log-in portal for business purposes. *See* Appx404-406. This suggests Cambria's experience makes it well-positioned to explain the differences between QSP production and fabrication, but it does not establish that fabricators are producers. MSI's Exhibits 2 and 3 consist of ITC questionnaires regarding QSPs from China and from India and Turkey, respectively, showing that at the time the ITC was also considering whether fabricators perform sufficient production-related activities for its own

injury purposes. Again, they do not establish that Commerce must treat fabricators as producers. *See* Appx407-531. MSI's Exhibit 4 is a transcript from an episode of the television show PBS Hometime, which shows that fabrication can be a step in the process of making a quartz countertop, but does not show its significance compared to overall quartz slab production. *See* Appx532-535. MSI's Exhibit 5 is an affidavit filed in a lawsuit against Cambria by one of its former fabricators, indicating that investment in the fabricator's shop was around six million dollars. *See* Appx536-544. That is a fraction, however, of the estimated forty to hundreds of millions in investment required for quartz slab production facilities. *See* Appx1027 (citing Appx885, Appx939-952). There is also record evidence that a fabricator shop can be established with significantly less investment than the six million dollar figure. *See id.*; Appx885-887, Appx939-943, Appx953-968.

MSI's Exhibit 6 contains declarations that MSI, an importer that sells imported QSPs to fabricators, solicited and/or obtained from fabricators opposing the petition. The declarations appear to be form letters with the square footage and 2018 value from each fabricator, along with identical, unsupported claims that the [ DESCRIPTION OF OPERATIONS ]. *See* Appx546-826. Although the declarations indicate that some fabricators oppose the petition, they do not require Commerce to find that fabricators perform sufficient production-related activities. Indeed, the declarations each state: [ DESCRIPTION

OF OPERATIONS

] *Id.* (emphasis added). Further, Cambria cited information contained in these declarations as additional evidence that fabricators rely on imported quartz slabs to produce final fabricated products. *See* Appx898.

MSI's Exhibit 7 consists of product brochures that do not provide further insight into the fabrication process. *See* Appx827-865. Consequently, none of MSI's exhibits, alone or together, compel Commerce to have reached the opposite conclusion in its industry support determination and find that fabricators are "producers" for industry support purposes.

Finally, to the extent that MSI relies on its own statements regarding the fabrication process, Commerce found that the activities MSI described were not sufficient to make fabricators "producers" for industry support purposes. *See* Appx1025, Appx1031 & nn.59-63, 122, 124-25 (illustrating Commerce's consideration of MSI's arguments in ultimately finding fabricators' activities insufficient).

Thus, based on the record before the agency, as created by the parties, Commerce reasonably determined that fabricators do not perform sufficient production-related activities to be considered domestic producers of QSPs for industry support purposes, and its determination should be affirmed.

### C. The Fact That The ITC Reached A Different Conclusion For Its Own Purposes Does Not Undermine Commerce's Determination

MSI contends that later-released ITC reports contradict Commerce's determination. *See* MSI Br. 50-52. However, the ITC and Commerce maintain separate records, have different statutory roles and deadlines, and although both consider each other's decisions as they are available throughout their separate processes, they make their determinations based on the evidence from their respective records. Hence as the Court of International Trade has explained: "For administrative ease and to avoid complications it would be helpful if the decisions of ITC and ITA were coterminous, but they are separate decisions that ultimately are made on separate bases." *Asociacion Colombiana de Exportadores de Flores v. United States*, 693 F. Supp. 1165, 1168 n.4 (Ct. Int'l Trade 1988); *see also Hosiden Corp. v. Advanced Display Mfrs. Of America*, 85 F.3d 1561, 1568 (Fed. Cir. 1996) (recognizing that "{t}he division of responsibility between the Commission and Commerce is integral to the statutory scheme" and this "division of labor has been upheld even where it has resulted in decisions which are difficult to reconcile . . . .") (citation omitted); *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1584-85 (Fed. Cir. 1990) (affirming Commerce's determination to define industry more broadly than ITC for differing purposes).

It is not unprecedented for Commerce and the ITC to reach different determinations regarding composition of the domestic industry for their respective

purposes of determining industry support and injury. For example, Commerce and the ITC defined the industry differently for different purposes in *Mitsubishi*. Nonetheless, the Court held that "{t}he Commission's determination of like products and separate industries does not undermine {Commerce's} determination that to prevent evasion the antidumping order should be broader." 898 F.2d at 1585. Further, based on the record in *Chlorinated Isocyanurates from China*, Commerce determined that tableters *did not* perform sufficient production-related activities and were not producers for purposes of determining industry support. *See* Chlorinated Isocyanurates Initiation, Appx1911-1919. The ITC, by contrast, found that tableters *did* perform sufficient production-related activities to be considered producers for purposes of determining injury. *See Chlorinated Isocyanurates from China and Japan*, Inv. Nos. 701-TA-501 and 731-TA-1226, USITC Pub. 4431, at 10-12 (Nov. 2013) (prelim.); *Chlorinated Isocyanurates from China and Japan*, Inv. Nos. 701-TA-501 and 731-TA-1226, USITC Pub. 4494, at 8-10 (Nov. 2014) (final).

As Commerce explained, although Commerce and the ITC may apply the same statutory term, such as "domestic like product," they do so for different purposes and pursuant to separate and distinct authority. *See Initiation*, 84 Fed. Reg. at 25,531; Appx1017. This may result in different definitions, but such differences do not render the decision of either agency contrary to law. *See, e.g.,*

*Algoma Steel Corp., Ltd. v. United States*, 688 F. Supp. 639, 642, 644 (Ct. Int'l Trade 1988) (discussing potential inconsistencies between Commerce and ITC), *aff'd*, 865 F.2d 240 (Fed. Cir. 1989); *Consol. Fibers, Inc., v. United States*, 574 F. Supp. 2d 1371, 1375 n.3 (Ct. Int'l Trade 2008) (same); *Hosiden*, 85 F.3d at 1568 (same); *Mitsubishi*, 898 F.2d at 1584-85 (same); *cf. USEC II*, 281 F. Supp. 2d at 1345-46, *aff'd, Eurodif I*, 411 F.3d at 1360-61 (upholding Commerce's different interpretation of "producer" in different contexts as lawful); *Union Steel*, 713 F.3d at 1107-10 (upholding different statutory interpretations in different contexts).

For this reason, MSI's argument that Commerce's determination should be given little deference based on the ITC finding, and that this Court should therefore engage in improper reweighing of evidence, lacks merit. *See* MSI Br. 18, 20-21, 50-51. Commerce has long employed the sufficient production-related activities test for its own distinct purposes. *See USEC I*, 259 F. Supp. 2d at 1327.

By statute, moreover Commerce must make its industry support determination *before* it initiates an investigation and notifies the ITC. 19 U.S.C. § 1673a(c)(2), (d)(2). The ITC then makes its preliminary determination forty-five days after the petition is filed. 19 U.S.C. § 1673b(a)(2). The statute also prohibits Commerce from reconsidering its industry support determination after initiation. 19 U.S.C. § 1673a(c)(4)(E). In other words, irrespective of any new or additional information, Commerce cannot reconsider its initial industry support decision.

Congress made that restriction on Commerce clear. *See* SAA at 862, *reprinted in* 1994 U.S.C.C.A.N. 4192 ("{T}he question of industry support will be resolved conclusively at the outset of a proceeding, thereby eliminating the burden on petitioners under current law of potentially rearguing this issue after initiation."). Here, Commerce analyzed the evidence on the record at the time of initiation, including the most recently available ITC report regarding QSPs, *i.e.*, the ITC preliminary report for the investigation of quartz surface products from China. *See* Appx1030-1031. Given the nature of the industry support determination, and Commerce's clear restriction, it was appropriate for Commerce to do so.

The Court should equally evaluate Commerce's decision based on the evidence available at initiation. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554-55 (1978) (If "litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening."); *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004) (same); *cf. Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (holding that trial court exceeded its authority by requiring Commerce to consider later-discovered evidence bearing on issue in dispute). As the trial court recognized, MSI's position suffers from a

"chronological fallacy" because Commerce did not know the ITC's determination at the time of initiation, and "it is only after Commerce determines industry support and decides to initiate an investigation that Commerce then notifies the ITC of its decision." Appx33.

The ITC's preliminary report regarding QSPs from China, consistent with Commerce's determination to exclude fabricators in its own investigation of QSPs from China, found that "the operations of stand-alone fabricators are insufficient to constitute domestic production of QSPs." *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416, USITC Pub. 4794, at 15 (June 2018) (prelim.). The ITC explained that the degree of capital investment necessary to fabricate quartz surface products was far below that required to produce quartz slab and that, although the expertise required of fabricators is not necessarily low, the quartz slab production process appears to involve considerably more specialized knowledge and employees. *See id.* It also found that "quartz slab constitutes the bulk of the value of the fabricated product." *Id.* Finally, the ITC considered the fact that "{f}abricators of QSP also appear to some degree to rely on imported quartz slab as an input in their production activities." *Id.* Commerce considered these findings, which were the only ones the ITC had made at the time of initiation, and reasonably found that they further supported the conclusion that fabricators do not perform sufficient production-related activities to be considered domestic

producers for purposes of determining industry support. *See* Appx1031. MSI's arguments that the ITC subsequently determined to include fabricators for purposes of evaluating injury does not alter the reasonableness of Commerce's determination based on the record at initiation.

## IV. Commerce Did Not Abuse Its Discretion By Declining To Extend The Deadline For Determining Industry Support

MSI faults Commerce for not extending the deadline for determining whether to initiate an investigation based on Cambria's petition because, in its view, there was insufficient evidence on industry support. MSI Br. 54-56. The statute, however, does not require Commerce to extend the initiation deadline. It grants Commerce discretion to extend the deadline an additional 20 days, if "exceptional circumstances" exist. 19 U.S.C. 1673a(c)(1)(B) ("In any case in which the administering authority is required to poll or otherwise determine support for the petition by the industry . . . the administering authority *may,* in *exceptional circumstances*, apply subparagraph (A) by substituting 'a maximum of 40 days' for '20 days.'") (emphasis added).

Congress intended that "Commerce {would} use this extension authority only in exceptional circumstances where the industry support issue cannot be decided in twenty days." SAA at 863, *reprinted in* 1994 U.S.C.C.A.N. 4193. Here, Commerce found sufficient evidence of the requisite support from domestic producers and workers, such that the petition requirements to initiate an

investigation were met. *See generally* Appx1017-1036; Appx1896-1898. Thus, there were no exceptional circumstances to warrant extension of the initiation decision deadline. *See* Appx34-35 (rejecting MSI's argument).

**CONCLUSION**

For these reasons, we respectfully request that the Court affirm the trial court's judgment.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Joshua E. Kurland
JOSHUA E. KURLAND
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.E.Kurland@usdoj.gov

OF COUNSEL:
VANIA WANG
Attorney
Department of Commerce
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

April 6, 2022

*Attorneys for Defendant-Appellee United States*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 10,591 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/ Joshua E. Kurland

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2022-1077

**Short Case Caption:** Pokarna Engineered Stone Limited v. United States

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 26 number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 04/06/2022

Signature: /s/ Joshua E. Kurland

Name: Joshua E. Kurland

**FORM 30. Certificate of Service** **Form 30**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2022-1077

**Short Case Caption** Pokarna Engineered Stone Limited vs. United States

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 04/06/2022

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☑ Other: Encrypted Email

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Jonathan Thomas Stoel | Hogan Lovells US LLP, 555 Thirteenth Street NW, Washington, DC 20004, jonathan.stoel@hoganlovells.com |
| Luke A. Meisner | Schagrin Associates, 900 7th St. NW Suite 500 Washington, DC 20001, lmeisner@schagrinassociates.com |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 04/06/2022 Signature: /s/ Joshua E. Kurland

Name: Joshua E. Kurland